Erick **BARBOSA** and Rossana Canechia, on behalf of themselves, and all others similarly situated, Plaintiffs,

v.

**TARGET MORTGAGE CORPORATION,** and Princeton Financial Corporation, Defendants.

No. 94–1938–CIV–RYSKAMP.

United States District Court, S.D. Florida.

June 24, 1997.

John Carl Strickfoot, Jr., Hugh F. Culverhouse, Jr., P.A., Miami, FL, Daniel A. Edelman, Cathleen M. Combs, O. Randolph Bragg, Edelman & Combs, Chicago, IL, Isabel Barney, Miami Beach, FL, Charles McLeon Baird, Atlanta, GA, for Erick Barbosa.

Steven Ellison, Broad & Cassel, West Palm Beach, FL, Kenneth Stephen Hoffman, Miami, FL, Molly McFarlane, Warner, Norcross & Judd, L.L.P., Grand Rapids, MI, for Target Mortg. Corp.

### ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon defendant Princeton Financial Corporation's ("Princeton") Renewed Motion for Partial Summary Judgment [DE 108], filed February 10, 1997. Plaintiffs have responded in opposition, and Princeton has replied. The instant motion requires the Court to determine whether Princeton, a residential mortgage lender, violated § 8 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, by paying to a mortgage broker a "yield spread differential" for closing a loan at a rate above par. The Court holds that under the circumstances of this case Target did not violate § 8.

## I. BACKGROUND

In early 1994, plaintiffs Erick Barbosa and Rossana Canechia were looking for a mortgage loan to finance the purchase of a home in North Miami Beach, Florida. Complaint ¶ 7. Initially, they approached defendant Target Mortgage Corporation ("Target"), a mortgage broker that specializes in matching lenders with borrowers. Bernstein Aff. ¶ 8. After a discussion about the fee Target would charge for its services and the interest rate it could procure from a mortgage lender, plaintiffs decided to shop around in the retail market. Id. At least one major lender, Citibank, rejected plaintiffs application. Id. They returned to Target in June of 1994 to seek help in securing a mortgage.

The parties dispute somewhat the status of plaintiffs' credit history at the time they applied for the mortgage loan. Plaintiffs claim that they had an excellent credit history, and the underwriter's comments substantiate their claim. Plaintiffs' Memo. in Opp.App. A. On the other hand, defendants claim that the plaintiffs presented a significant challenge to Target in obtaining a loan. Bernstein Aff. ¶ 9. Both Barbosa and Canechia had sporadic employment records and lacked a stable residential record. Id. §§ 23–25. Target claims that it spent a substantial amount of time collecting verifications of employment, wage statements, and credit history reports, as well as in developing persuasive written justifications for the sporadic job and residential histories, and in shopping for a loan from the various possible lenders. Id. §§ 26–31.

In the end, Target obtained for plaintiffs a thirty-year, $70,200 mortgage loan from defendant Princeton. Princeton is a mortgage banker specializing in loan mortgage loan origination and mortgage loan servicing. Warrington Aff. ¶ 3. The company originates loans primarily for the purpose of selling them to investors such as Fannie Mae or Freddie Mack.[1] Id. Princeton then retains servicing rights to the loans, and collects a fee from the secondary market investor for servicing the loans. Id. Princeton enters the loan origination market chiefly to obtain these servicing rights. Since Princeton plans to sell the loans immediately, it has no real concern over the interest rate on the loan or the corresponding points; whatever terms it gives it will immediately recoup in the sale of the mortgage on the secondary market. Id. ¶ 5. The real prize is the servicing rights.

Plaintiffs, of course, had no interest in Princeton's financial structure. They just wanted to obtain a mortgage on the best terms possible. According to plaintiffs, Target promised to get them the lowest interest rate on the market. Originally, plaintiffs

---

1. Princeton sold plaintiffs' mortgage on the secondary market a month and a half after closing.

applied to Princeton for a loan at 8.75%. They closed, however, at 9.5%. Plaintiffs claim that Target falsely informed them that the increase in interest rate merely reflected a change in market prices. According ·to plaintiffs, the real reason for the increase was a surreptitious deal between Princeton and Target that increased the interest rate and bloated plaintiffs financing costs by $18,-363 over the life of the loan.

In addition to promising to pay Princeton (or its successor) interest at 9.5% over the thirty-year life of the mortgage, plaintiffs paid Target a loan origination fee of $351, a loan discount fee of $702, and a $65 processing fee, for a total fee of 1.59% of the loan amount. The transaction's HUD–1 settlement statement[2] also showed the following: "Yield Diff to TM (2457 00 P.O.C.)." Complaint, Ex. B. As plaintiffs now understand, this represented· a payment by Princeton to Target of $2457 for a "yield spread differential." The function and legality of that payment is the subject of this opinion.

A little more detail on the relationship between Princeton and Target is required in order to understand the payment of the yield spread differential. Target itself lacks the financial means to fund mortgages, so it only serves as a middleman between the lender and the borrower. Bernstein Aff.· ¶ 6. As a broker, it can only receive compensation for its services from the borrower, the seller, or the lender. Id. ¶ 15. In this case, the Purchase and Sale Agreement between plaintiffs and the seller provided that the seller would pay no more than· one half a point toward the settlement fees. Id. ¶ 17. Upon review of plaintiffs' financial records, Target figured that plaintiffs could not afford the remaining compensation to which Target felt itself entitled. Id. ¶ 17. This left the lender to provide further compensation. In fact, Princeton has provided a compensation method for brokers. On a daily basis, Princeton circulates to its brokers a Correspondent Rate Sheet. Def's Memo. in Support of Mot. for

Sum. Jud't, Ex. A. The Rate Sheet sets forth prices Princeton will pay to brokers for securing various types of mortgages at various rates of interest. At the par interest rate, the broker receives no payment from Princeton, but the broker (or, rather, his client) also pays no points. The borrower could also secure an interest rate below par by paying points. As previously discussed, Target felt that this was not an option for plaintiffs. Of course, buyers would prefer either to lock in at par without paying points or to lock in below par by paying points, but this leaves the broker with no compensation from the lender. Princeton's Rate Sheet establishes a method to compensate brokers by allowing the brokers to select an above-par rate at which to close, and then paying the broker a portion of the interest earned from the above-par lock-in as compensation. The industry refers to this earning from the above-par lock as a "yield spread differential."[3]

In the present case, Target selected a rate above par at 9.5%. In return, it received the yield . spread differential compensation of $2457. Plaintiffs have now sued Princeton alleging that this payment violated § 8 of RESPA.[4] In Count II of the Second Amended Complaint, plaintiffs claim that the payment of the yield spread differential violated § 8(a) because it was paid to Target for the referral of business. In Count III, they allege that the yield spread differential violated § 8(b) because it was a split fee paid for services not actually performed. Princeton has now moved for summary judgment on Counts II and III, claiming that the undisputed record evidence reveals that these claims must fail as a matter of law.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) sets forth the standard governing summary judgment. In its most basic form, summary judgment is appropriate where there is no genuine issue of material fact in dispute and

---

**2.** "HUD–1 is a form provided to buyers and sellers disclosing the settlement charges that will be assessed to each." *Bloom v. Martin,* 77 F.3d 318, 319 (9th Cir.1996). It is required under 24 C.F.R. § 3500.8(a).

**3.** The yield spread differential is also known as a "yield spread premium," or an "overage."

**4.** Target is also joined as a defendant to this action, but not on the RESPA counts.

the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the party opposing summary judgment may not simply rely on the pleadings or mere denials of the allegations. Rather, the opposing party must adduce some evidence showing that material facts are in issue. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Eleventh Circuit has restated the method for allocating burdens in a summary judgment motion. Specifically, in accordance with U.S. Supreme Court precedent,

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

## III. *DISCUSSION*

Plaintiffs tell a troubling tale. Two unsophisticated young people sought a loan to finance the American dream. Spurned by the megalenders, they turned for help to a mortgage broker. He promised them the lowest interest rate on the market, and they believed him. At closing, an interest rate higher than expected appeared on the papers. They inquired, and he lied, saying that interest rates were up. Unbeknownst to the borrowers, the broker had cut a secret deal with lender. If the broker could jack up the interest rate, the lender would kick back a cut of the excess profits. The broker would net $2457 from the scheme, and the borrower would pay an additional, staggering $18,363 over the life of the loan. The borrowers have now found out about this plot, and want to bring the lender and broker to justice (to the tune of treble damages).

However compelling this story, if true, the Court does not hold a general license to ferret out the alleged frauds and breaches of trust and to punish the offenders. The instant motion presents a set of narrow questions arising under a discrete federal statute. Additionally, the principal culprit (assuming the misrepresentation story is true), Target, is not before the Court on this motion. Thus, the legality of Princeton's actions, and not the justice of plaintiffs' quarrel, must guide the Court's deliberation. The meaning of RESPA and its implementing regulations comprises the sole question for review.

In 1974, Congress enacted RESPA "to provide for greater disclosure of the nature and costs of real estate settlement services, [and] to eliminate the payment of kickbacks and unearned fees in connection with settlement services provided in federally related mortgage transactions." S.Rep. No. 93–866, at 1 (1974), 1974 WL 11646 * 1, *reprinted in* 1974 U.S.C.C.A.N. 6546. Four subsections of RESPA § 8 provide the relevant texts for the present discussion. Subsection (a) forbids any person to give or accept "any fee, kickback, or thing of value pursuant to an agreement or understanding, oral or otherwise, that business incident to a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). Subsection (b) prohibits any person to give or accept "any portion, split, or percentage of any

charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b). Subsection (c) trumps subsections (a) and (b) by providing that "[n]othing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c). Finally, subsection (d) provides: "Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." 12 U.S.C. § 2607(d).

The four statutory subsections create four questions for the Court's determination. First, Princeton argues that plaintiffs do not have standing to sue under subsection (d), because they are not "persons charged for the settlement service involved in the violation." Second, Princeton argues that it did not violate subsection (a), because it did not pay Target a referral fee. Third, Princeton disputes that it has either split any fee with Target, or provided payment for services not actually performed. Finally, Princeton argues that whatever the determination of the first three questions, subsection (c) relieves it of any liability because the payment of the yield spread differential was for goods or services actually performed. Before considering each of these textual arguments, the Court will offer some general comments on the background to the present dispute over the meaning of § 8 of RESPA.

## A. Legal Context

The legality of yield spread differentials has troubled the few courts that have thus far had occasion to examine the issue. At least two district courts have issued pronouncements only to issue explanatory or vacating opinions a short time later. In *Briggs v. Countrywide Funding Corp.*, 931

F.Supp. 1545, 1552 (M.D.Ala.1996), the District Court initially filed an opinion which seemed to suggest that the payment of yield spread differentials would constitute a kickback forbidden by 12 U.S.C. § 2607(a) and by HUD Regulation X, 24 C.F.R. § 3500.14. Five months later, the court reconsidered and vacated its opinion on federal preemption grounds. *Briggs v. Countrywide Funding Corp.*, 949 F.Supp. 812 (M.D.Ala.1996).[5] In *Mentecki v. Saxon Mortgage, Inc.*, 1997 WL 45088 (E.D.Va.), the court issued an original opinion declining to dismiss the complaint's charges that the payment of a yield spread premium violates RESPA. Indeed, the Court "conclude[d] that the payment of a yield spread premium is a referral prohibited by 12 U.S.C. § 2607(a)." *Id.* at *4. Not a month later, the court issued a second, shorter opinion, clarifying that "[c]ertainly the court has not reached a final decision about the legality of yield spread premiums." *Mentecki v. Saxon Mortgage, Inc.*, Case No. 96–1629–A–CIV (Order of Feb. 7, 1997). Thus, neither case provides any conclusive direction on the yield spread differential issue.

The Department of Housing and Urban Development ("HUD"), the agency charged with promulgating regulations to implement the requirements of RESPA, has been equally unclear in its indications on the propriety of yield spread differentials. The defendants in these RESPA cases springing up across the country vigorously call to the courts' attention a HUD regulation requiring the disclosure of yield spread differentials on the required HUD–1 Settlement Statements: "Any other fee or payment received by the mortgage broker from either the lender or the borrower arising from the initial funding transaction, including a servicing release premium or yield spread premium, is to be noted on the Good Faith Estimate and listed in the 800 series of the HUD–1 Settlement Statement." 24 C.F.R. § 3500.13, Appendix B. How can it be, they argue, that something that HUD requires to be disclosed could be forbidden by the statute or regulations? Since HUD was obviously aware of the exis-

---

**5.** The court's vacation of its prior opinion on preemption grounds does not, however, under-

mine the persuasive force of the prior opinion's dicta on the interpretation of RESPA.

tence of yield spread differentials, it could have banned them if that was its intention, assuming of course that RESPA would bear a HUD interpretation calling yield spread differentials illegal.[6] This argument has its merits, but does not quite avail for two reasons. First, as the *Mentecki* court noted in its vacated opinion, "the agency has gone out of its way to emphasize that it 'has never enunciated' a formal policy on the legality of certain indirect payments, including yield spread premiums." 1997 WL 45088 *3, *citing* 60 Fed.Reg. 47650, 47654–55. Second, plaintiffs argue that even if HUD had approved the payment of some yield spread differentials, the agency might only intend to allow such payments where the buyer has locked into an interest rate prior to closing, and the Federal Reserve lowers interest rates during the time between the lock-in and closing, thus creating a windfall for the lender. Thus, HUD may have intended to approve some yield spread differentials and to disapprove others.

As of yet, HUD has not issued any regulation either forbidding or allowing the payment of yield spread differentials. Apparently, the agency's members have been unable to agree on a solution. *See HUD Panel at Impasse on Indirect Broker Fees,* 6 Mortgage Marketplace 12 (March 25, 1996); *see also Mentecki,* 1997 WL 45088 *3 (noting that "[t]he issue of whether [yield spread differentials] should be endorsed is currently the subject of proposed amendments to HUD's regulations implementing RESPA"). This has led the parties to search for clues in the correspondence of HUD's officials regarding HUD's current thinking on the issue of yield spread differentials.[7] HUD's game of winking, nodding, and frowning leaves the Court with no clear administrative direction.

■ This is not particularly troubling. Federal courts are free to interpret federal statutes without the help of administrative agencies. Indeed, on one prior occasion, this Court has expressed some preliminary views on yield spread differentials. In *Martinez v. Weyerhaeuser Mortgage Co.,* 959 F.Supp. 1511, 1522 (S.D.Fla.1996), the undersigned declined to grant partial summary judgment on the RESPA yield spread differential count, finding a genuine issue of material fact as to whether the payment was duplicative of the other fees already charged to the borrowers. *Martinez,* however, was decided upon a different record than the present one, and does not bind the Court to any particular result in the present case.[8]

One final opinion warrants mention. In *Culpepper v. Inland Mortgage Corp.,* 953 F.Supp. 367 (N.D.Ala.1997), the Northern District of Alabama finally came down with the opinion that everyone has been looking for—a square statement on the legality of yield spread differentials. Much to the chagrin of the plaintiffs' bar, Judge Hancock held that the payment of a yield spread premium is not a kickback forbidden by subsection (a). His opinion does not address the further question raised in the instant case—whether the payment of a yield spread differential constitutes fee splitting forbidden by subsection (b).

With this as background, the Court must now draw its own conclusions on the legality of yield spread differentials under § 8 of RESPA. Since the question is relatively fresh, the Court must rely primarily on the text of the statute and the implementing regulations.

## B. Statutory Construction

### 1. Standing

■ As a threshold matter, Princeton argues that plaintiffs lack standing to sue be-

---

**6.** The Court expresses no opinion on whether a HUD interpretation of § 8 calling yield spread differentials per se illegal would be entitled to deference from the judiciary.

**7.** Princeton cites to an August 20, 1996 letter from an Assistant Secretary at HUD, expressing the view that a mortgage is a "good" within the meaning of § 8(c). The implications of this issue are discussed below.

**8.** Judge Hancock also distinguishes this Court's *Weyerhaeuser* decision, noting that this Court "did not address the argument that a yield spread premium is part of the payment a lender makes for the purchase of loans." 953 F.Supp. at 372 n. 8.

cause they are not "persons charged for the settlement service involved in the violation," as required under subsection (d). Quite cleverly, Princeton points out that *it* paid the yield spread differential, so, if anyone, *it* would be the one with standing to sue Target. Since the payment was neither added to plaintiffs' principal balance nor charged to plaintiffs in cash at closing, says Princeton, plaintiffs never paid a dime of the yield spread differential. Additionally, Princeton notes that it does not receive the benefit for the higher interest payments, because it sold the loan on the secondary market, reserving only servicing rights. Finally, Princeton traps plaintiffs in a statutory snare of their own construction. RESPA prohibits the "giving or accepting" of fees that violate its provisions. If Princeton is to be held liable, it must be because *it* "gave" payment to Target. Plaintiffs, however, now allege that *they* "gave" the payment to Target. Though Princeton does not quite conclude this thought (perhaps since the conclusion is a little too ironic), the logical implication seems to be that if plaintiffs paid a fee forbidden by RESPA, then *plaintiffs* are the unwitting lawbreakers.

At first blush, this neatly packaged analysis of the statute seems nearly invincible. Plaintiffs fall back on the arguments that Congress could not possibly have intended such a result because it would prevent any borrower to challenge a referral fee, and because the *Mentecki* court (in its vacated opinion) rejected this argument. Neither of plaintiffs' arguments, without more, would suffice to overcome the plain language of the statute.

■ Plaintiffs also make an attempt at statutory construction. They argue that while they were "charged" for the disputed settlement services, this does not mean that they must have "paid" the charged amount. In plaintiffs' theory, once a borrower has been charged for a settlement service, he may maintain an action against anyone who pays a forbidden fee in the same transaction. This reading, however, does violence to subsection (d)(2)'s specification that the "settlement services" be the ones "involved in the violation." Even though plaintiffs were

charged for other "settlement services," they do not have standing to sue unless they were "charged for the settlement service *involved in the violation.*" 12 U.S.C. § 2607(d) (emphasis added). Therefore, unless the plaintiffs were charged for the yield spread differential, they may not maintain this action for damages.

The mere fact that Princeton may have been "charged" for the yield spread differential, however, does not mean that plaintiffs may not also have been charged for the same amount. The nonobvious flaw in Princeton's argument appears to be the assumption that only one person may be "charged" for a particular "settlement service." In this case, it appears to the Court that both Princeton and plaintiffs were "charged" for the yield spread differential. Princeton was charged in the short run, and plaintiffs in the long run. By Princeton's own admission, the payment of the yield spread differential was made possible by plaintiffs' promise to pay interest at a rate over par throughout the life of the loan. Indeed, Princeton seeks to justify the payment of the yield spread differential by labeling it as compensation for Target's services, drawn from the excess money that plaintiffs would pay on the mortgage. Thus, in economic reality Target charged Princeton, which in turn charged plaintiffs. Although the Court could find that "charged" means "directly charged," Princeton offers no reason why the Court must give the statute so niggardly a construction. The Court finds that subsection (d), in its most logical construction, accords plaintiffs a right of action.

## 2. Referral Fee?

■ Turning now to the merits, the Court must first address plaintiffs' contention that in paying Target the yield spread differential, Princeton gave a kick back for a referral, forbidden by subsection (a). As previously noted, the *Culpepper* court found, contrary to plaintiff's position, that the yield spread differential was a "market-driven purchase price that [the lender] paid for the [borrower's] loan." 953 F.Supp. at 371. As a matter of first impression, this analysis appears equally persuasive in the present case. The

undisputed record evidence reveals that Princeton considers the yield spread differential to be a form of compensation that brokers may choose to accept in exchange for their services in packaging the borrower's application where the borrower is unable to pay the broker the full value of its services in cash. No one disputes that Target provided the plaintiffs with valuable services. Thus, this clearly was not one of the surreptitious kickback cases contemplated in RESPA's Senate Report, which singles out such abuses as a 10% kickback by a title insurance company to an attorney who simply places a call or fills out a simple application, an attorney who gives a fee to another attorney simply for referring a client, or a title insurance company's payment to a subsidiary of a savings and loan institution where the subsidiary performed no substantial services. S.Rep. No. 93–866 (1974), 1974 WL 11646 * 6, *reprinted in* 1974 U.S.C.C.A.N. 6546; *see also Real Estate Settlement Costs: Hearings on H.R.. 9989 Before the Subcomm. on Housing of the Committee on Banking and Currency,* 93rd Cong. 60 (1973) (Statement of Sheldon B. Lubar, Assistant Secretary–Commissioner for Housing Production and Mortgage Credit, HUD) (offering as example of kickback "a lawyer charging for a full scale title search when only a partial search has been made").

Additionally, if the yield spread differential was paid for anything of a questionable nature, it was paid for Target's procurement of a loan at a percentage rate over par, not for the mere referral of business.[9] If Target had "referred" a loan at 8.75% rather than 9.5%, Princeton would not have remitted a check for $2457. Loans procured by Target at 8/75% and 9.5% are equally "referred" or not "referred;" the difference is that second one produces a higher monthly payment for Princeton's secondary market purchaser than

the first, thus enabling Princeton to pay Target a fee either for its services or for having procured a loan at a higher interest rate, however one wishes to see it. The economics of the transaction, however, do not support the inference that the yield spread differential constitutes a referral fee.

From a straightforward reading of the statute, the Court concludes that Princeton cannot have violated subsection (a), because the undisputed record evidence establishes that its payment to Target was not for the referral of business. HUD's definition of "referral" further supports this conclusion.

> A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business.[10]

24 C.F.R. § 3500.14(f)(1). Princeton's publication of its Correspondent Rate Sheet was a signal to Target that it had three options. First, it could take a loan a rate below par, pay points to Princeton, and try to squeeze brokerage fees out of the cash-strapped plaintiffs. Second, it could take a loan at par, break even with Princeton, and again try to squeeze brokerage fees out of the cash-strapped borrowers. Finally, it could take a rate above par, relieving plaintiffs of the obligation to come up with the full value of the broker's services at closing, and increasing (or at least not decreasing) the value of the loan to Princeton (or to its secondary market purchaser). Princeton therefore did not pay Target the yield spread differential for "affirmatively influencing the selection by any person of a provider of a settlement

---

**9.** It is not clear from the record whether the payment of $2457 merely represents the reduction to present value of any additional amounts that Princeton (or its successor) would take in over the life of the loan. However, Princeton represents that it is indifferent as to whether or not the broker takes a yield spread differential, because Princeton receives the same price on the secondary market whether it locks in a higher interest rate and pays the correspondent yield spread differential or locks in at par and pays no

yield spread differential. If this is true, it must be because the payment to the broker merely represents the present value reduction of the increase in the borrower's payments over thirty years.

**10.** HUD offers a second definition of "referral," which does not affect the present discussion. *See* 24 C.F.R. § 3500.14(f)(2).

service," but for Target's procurement of a loan that matched the third option. Thus, even under HUD's definition, plaintiffs have offered no evidence that the yield spread differential was paid in exchange for a referral of business.

### 3. Fee Splitting?

The Court must next decide whether the payment of the yield spread differential violated subsection (b)'s prohibition on splitting charges "other than for services actually performed." This subsection only applies to situations where "two parties [ ] share fees." *Durr v. Intercounty Title Co. of Illinois*, 14 F.3d 1183, 1187 (7th Cir.), *citing Mercado v. Calumet Federal Sav. & Loan Ass'n*, 763 F.2d 269, 270 (7th Cir.1985), *cert. denied*, 513 U.S. 811, 115 S.Ct. 63, 130 L.Ed.2d 20 (1994); *see also Duggan v. Independent Mortgage Co.*, 670 F.Supp. 652, 653–54 (E.D.Va.1987) (citing same proposition from *Mercado* ); *Campbell v. Machias Sav. Bank*, 865 F.Supp. 26, 31 n. 5 (D.Me.1994) (same). As the District Court noted in *Durr*, the "exceedingly plain meaning of the statute [is that it] target[s] only the *division* of charges where the giver is involved in rendering a 'real estate settlement service.'" *Durr v. Intercounty Title Co. of Illinois*, 826 F.Supp. 259, 262 (N.D.Ill.1993) (emphasis in original), *affd.*, 14 F.3d 1183 (7th Cir.1994). Thus, plaintiffs cannot even reach the "services actually performed" issue until they first establish proof of fee splitting.

Princeton argues that plaintiffs have not offered any evidence of a fee split, so as to bring this case within the ambit of subsection (b). Plaintiffs respond that interest paid on the loan was compensation for the "real estate settlement service" of providing the loan itself. In their view, Princeton and Target split the interest, thus splitting part of the charge for the service, in violation of the statute. The strength of this argument depends upon plaintiffs' apparent assumption that the provision of a mortgage loan is "the rendering of a real estate settlement service." If the relevant "service" is the provision of a loan, and the interest on the loan is compensation for that service, then Princeton and Target did split the fee for a service. The Sixth Circuit, however, has held in an

exhaustive opinion that the making of a loan is not a settlement service within the meaning of RESPA. *United States v. Graham Mortgage Corp.*, 740 F.2d 414 (6th Cir.1984). In *Graham Mortgage*, the court noted that some of HUD's regulatory pronouncements could be interpreted as supporting a contrary position, but that HUD had failed to maintain a consistent opinion on the issue. *Id.* at 422. The court also found that neither the plain language of RESPA nor the statute's legislative history supported a contrary position. *Id.* at 417–21. Since *Graham Mortgage* was a criminal case, the court applied the rule of lenity and found that loan origination was not a settlement service.

Subsequent to *Graham Mortgage*, HUD issued a definition of "settlement service" that would appear to include charging interest on mortgage loans. *See* 24 C.F.R. § 3500.2(b) ("*Settlement Service* means ... [o]rigination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans.)"). Thus, even if this Court were to accept *Graham Mortgage's* premise, subsequent pronouncements by HUD would undermine the authority of that opinion, assuming that the new regulations were consonant with the text of RESPA itself. Of course, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). It is also true, however, that "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9. The Supreme Court has not hesitated to override regulations promulgated by administrative agencies when traditional tools of statutory construction render a result contrary to the agency's position. *See I.N.S v. Cardoza Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Dole v. United Steelworkers of America*, 494 U.S. 26, 42, 110 S.Ct. 929, 938, 108 L.Ed.2d 23 (1990); *see*

*also Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992) ("In a statutory construction case, the beginning point must be the language of the statute, and when the statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." ); *MCI Telecommunications Corp. v. American Telephone and Telegraph Co.,* 512 U.S. 218, 229–31, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear. . . ."); *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 603–04, 112 L.Ed.2d 608 (1991) (When the language of a statute is plain, administrative interpretation of the statute is not entitled to deference).

■ Although from review of the legislative history discussed in *Graham Mortgage* the Court thinks it rather unlikely that Congress intended to comprehend the long-term lending of mortgage funds within the concept of "settlement service," the Court also cannot say that HUD's interpretation transgresses the plain language of the statute.[11] The Court must therefore defer to HUD's regulation as to the meaning of "settlement service," and conclude that mortgage interest can be a charge for a settlement service within the meaning of subsection (b). On the basis of this conclusion, the Court further holds that the splitting of interest payments from a mortgage loan could be "splitting charges" forbidden by RESPA. Thus, on this motion for summary judgment plaintiffs must prevail on the threshold issue with regard to subsection (b)—whether Target and Princeton even split a charge for a settlement service.

Prevailing on this issue alone would not enable plaintiffs to defeat Princeton's motion for summary judgment. Even flagrant charge-splitters incur no RESPA liability unless they split a charge "other than for services actually performed." 12 U.S.C. § 2607(b). While plaintiffs of course argue that Target provided no services to earn the $2457, Princeton argues that it paid Target the yield spread differential in exchange for Target's services in helping the plaintiffs to secure a loan. The issue of whether the payment was made "for services actually performed" within the meaning of subsection (b) overlaps with the almost identical issue of whether the payment falls within the trump card provision of subsection (c). The Court will treat this aspect of the subsection (b) inquiry and the "services actually performed" aspect of the subsection (c) inquiry together.

### 4. The Trump Card

Reading through the first three subsections of RESPA § 8, the section's basic structure appears as follows: one could be *prima facie* liable under subsection (a) for receiving a kickback or unearned fee for the referral of business; one could also be *prima facie* liable under subsection (b) for splitting charges other than for services actually performed; but even if one were found *prima facie* liable under subsection (a) or (b), one could avoid liability under subsection (c) if the compensation or payment was made "for goods or facilities actually furnished or for services actually performed." Such a mechanistic reading of the statute obfuscates the interplay between the three sections that appears upon closer examination. In effect, both subsection (a) and subsection (b) contain a discrete element—referral of business in (a), and fee splitting in (b). Yet both subsections also incorporate the theme stated explicitly again in (c), that the payment made must not have been made for services actually performed or goods actually furnished. Thus, defendants can prevail either by showing that there was neither fee splitting nor payment for a referral, or by showing that what appeared to be a referral fee or charge split was in fact a payment for services actually performed.

■ The Court must therefore decide whether the payment of the yield spread differential compensated Target for services actually rendered. As an initial matter, the Court rejects the two possible extreme positions that the parties raise in their memoranda. One extreme, that alluded to by defendant, is to hold that since Target un-

---

11. Also, the rule of lenity aspect of *Graham Mort-* · *gage* does not apply in this civil case.

questionably provided some valuable services to plaintiffs, the payment of the yield spread differential must have been for those services. This position would foreclose liability whenever the recipient of a referral fee or split charge had provided services to the borrower, whether or not the fee was in fact paid to compensate the broker for those services. Section 8 contains no justification for such an automatic linkage between the provision of services by a broker and the payment of funds to the broker. A broker might provide services for which the borrowers or sellers fully compensated him, and still receive a kick-back for referring business to the lender.

■ On the other extreme, plaintiffs appear to argue that because Target received a total of $1118 in fees from the sellers and borrowers, the additional $2457 could not possibly have been compensation for Target's efforts in securing the mortgage loan. This does not follow. Just as plaintiffs and the sellers agreed to share closing costs (the sellers agreed to pay up to half a point), it is entirely conceivable that the parties might structure the mortgage transaction to permit the borrowers and the lender to share in paying the broker's commission. Thus, neither the fact that Target provided some bona fide services, nor the fact that the borrowers and sellers paid Target some compensation, requires a finding that the payment of the yield spread differential was for services performed or was not for services performed.

■ The Court must also reject what plaintiffs characterize as being Princeton's position [12]—that since the value to Princeton of this mortgage agreement exceeded $2457, the payment of the yield spread differential merely reflected the value of the "good" Target provided to Princeton. Plaintiffs point to HUD's Regulation X, which provides, in relevant part:

> The value of a referral (i.e., the value of any additional business obtained thereby) is not to be taken into account in determining whether the payment exceeds the rea-

sonable value of such goods facilities or services.

24 C.F.R. § 3500.14(g)(2). As plaintiffs perceptively argue, a contrary rule would obliterate any sanction against unearned kickbacks. No rational lender ever pays more for an asset than the asset is worth. If RESPA measures the value of the referral by the worth to the lender of obtaining the mortgage note, then only the unfortunate lender who pays more for the referral than the referral is worth violates the anti-kickback and fee-splitting provisions. Because Congress could not have intended § 8 to impose only an idiot tax, the Court must reject this position.

■ Although the Court holds that the whether the payment of the yield spread differential was made for services actually performed or goods actually provided cannot be determined by examining the value to Princeton of obtaining plaintiffs' mortgage note, this does not mean that Princeton's perspective on the matter must be ignored. This, in essence, is what plaintiffs would have the Court to do. They argue as follows: RESPA's implementing regulations and legislative history indicate that when lenders pay brokers fees that exceed the reasonable value of the brokers' actual services, the court may presume that the excess payments represent referral fees or kick-backs. In this case, we know that Princeton paid Target a referral fee, because the yield spread differential alone equaled 3.5% of the principal amount of the loan, and combined with the fees paid by the borrowers and sellers constituted 5.1% of principal. Since industry-wide brokers receive on average 1.5%, the extra 3.6% must be a referral fee.

■ Plaintiffs are correct that RESPA's legislative history and implementing regulations support the view that RESPA forbids the payment of fees that are out of line with the value of the services provided. The Senate Report notes that

> Subsection [ ] (c) makes clear that section 7 is not intended to prohibit the payment ... for goods furnished or services actually rendered, so long as the payment bears

---

12. The Court rather doubts that this is in fact Princeton's position.

a reasonable relationship to the value of the goods or services received by the person or company making the payment. To the extent the payment is in excess of the reasonable value of the goods provided or services performed, the excess may be considered a kickback or referral fee proscribed by section 7.

S.Rep. No. 93–866 (1974), 1974 WL 11646 * 6, *reprinted in* 1974 U.S.C.C.A.N. 6546. Similarly, the House Committee on Banking and Currency' Report noted:

To the extent the payment is in excess of the reasonable value of the goods provided or services performed, the excess may be considered a kick-back or referral fee proscribed by section 106. Those persons and companies that provide settlement services should therefore take measures to ensure that any payments they make or commissions they give are not out of line with the reasonable value of the services received.

H. Rep. No. 93–1177, at 6 (1974). Finally, HUD's regulations incorporate the intent of Congress regarding the requirement of a reasonable relationship between the amount of payment and the value of the services: "If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for goods and services actually performed or provided." 24 C.F.R. § 3500.14(g)(2).

Having established that payments that do not reflect the reasonable value of services are presumed to be forbidden referral fees under RESPA, plaintiffs rest upon the discrepancy between the purported national average compensation for brokers and the total compensation to Target for working on plaintiffs' application. This, they claim, at least establishes a genuine issue of material fact as to whether the yield spread differential constituted a kick-back. The Court must disagree. Plaintiffs assume that reasonable market value for a particular service should be ascertained by looking to national averages rather than to the market forces that led to the payment of a particular price for that particular service. This approach suffers from at least two essential flaws.

First, it ignores the fact that the national average for a broad classification of services is merely the averaging of the figures brokers receive for settlement services ranging from the very simple to the very complex. If the Court were to accept 1 or 2% as a mandatory industry baseline for what is "reasonable," then borrowers with more complicated needs would find few brokers willing to represent their interests. A price ceiling formulated by averaging a set of highly differentiated services does not produce a single "reasonable market price." *See Real Estate Settlement Costs: Hearings on H.R. 9989 Before the Subcomm. on Housing of the Committee on Banking and Currency,* 93rd Cong. 60 (1973) (Statement of Sheldon B. Lubar, Assistant Secretary–Commissioner for Housing and Mortgage Credit, HUD) ("Attempting to regulate settlement costs nationwide ... would be virtually impossible in view of the wide variances in settlement practices.").

Second, and more fundamentally, plaintiffs err in assuming that RESPA creates a single national standard for assessing the reasonableness of fees. From the statute's legislative history, it appears that Congress debated two separate solutions to the real estate settlement procedures quandary. The first involved Congress in setting rates directly, "that is to provide for legal maxima on the charges which may be imposed for services incident to real estate settlements." S.Rep. No. 93–866 (1974), 1974 WL 11646 * 3, *reprinted in* 1974 U.S.C.C.A.N. 6546. Congress, rejected this proposal, deciding instead "to regulate the underlying business relationship and procedures of which costs are a function." *Id., see also* H. Rep. No. 93–1177, at 6 (1974) (same). The House Subcommittee hearings abound with statements in opposition to federal ratemaking for settlement services. Representative Stephens, the House sponsor of the bill that ultimately prevailed, offered the following assessment:

My basic approach ... was to preserve the consumer-oriented sections of the original Title IX that eliminated abusive practices or required full disclosure in advance of all settlement costs, but not to involve the federal government, as some suggested, in a wholesale regulation of charges for ...

elements of settlement costs. Such a wholesale federal intrusion into real estate settlement transactions, which are essentially local in nature, was not warranted in view of the fact that we were taking resolute action to attack abuses that have been demonstrated.

*Real Estate Settlement Costs: Hearings on H.R. 9989 Before the Subcomm. on Housing of the Committee on Banking and Currency,* 93rd Cong. 48 (1973) (Statement of Rep. Stephens). Similarly, the Chairman of the Federal Home Loan Bank Board attacked the proposals to assign HUD a rate-setting function:

> First, rate regulation in this case is merely symptomatic treatment. It is like the administration of a painkiller as a remedy for appendicitis. Second, rate regulation in this case is likely to create a bureaucratic monstrosity. Third, rate regulation is contrary to this country's traditional philosophy regarding the role of the marketplace. Fourth, generally speaking, rate regulation not only does not work well, but itself creates serious distortions and instabilities in the market.

*Id.* at 51 (Statement of Thomas R. Bomar, Chairman, Federal Home Loan Bank Board). One witness, testifying in favor of the prevailing bill, opposed federal ratemaking because "[s]ettlement services . . . are essentially local in nature, with many differences, because of legitimate differences that arise from local laws and local economic conditions." *Id.* at 98 (Statement of Fletcher G. Rush, General Counsel, Lawyers Title Guaranty Fund of Florida). Thus, Congress clearly did not believe that HUD should play any role in setting maximum or minimum rates for settlement services.

If the Court were to accept plaintiffs' proposal for determining the reasonableness of settlement fees by averaging the prices that other brokers charge for similar services, this would essentially place the Court in the role of setting "legal maxima on the charges which may be imposed for services incident to real estate settlements." Plaintiffs may respond that they do not ask the Court to set rates, but merely to inquire if the rate charged was "reasonable." But if the Court

is to determine reasonableness by hearing expert testimony regarding national averages, the net effect of its decision would be to set a de facto maximum "reasonable" rate for the provision of settlement services. If Congress rejected a ratemaking role for itself and for HUD, it is inconceivable that it intended such a role for the federal courts.

■ On the basis of these considerations, the Court believes that whether the payment of a particular settlement fee is reasonable should not be determined by looking for some platonic form of reasonableness inherent in national averages. Rather, as the House and Senate Reports suggest, it should be ascertained by looking to the processes that resulted in the payment of that particular fee. If arms-length bargaining in the mortgage marketplace set the payment for the broker's services, the payment is reasonable enough within the meaning of RESPA, whether or not plaintiffs can produce twenty omniscient experts who will swear that brokers in California and Maine charge thirty times less for similar services. RESPA sets processes, not prices.

■ How, then, do we know whether the payment of this $2457 yield spread differential resulted from arms-length bargaining or from a surreptitious deal to the detriment of the borrowers? Plaintiffs suggest that the yield spread differential could not have resulted from any bargaining on their behalf because they were not even aware that Princeton was paying Target such a fee. Putting aside plaintiffs' constructive, if not actual, notice on the HUD-1 form, plaintiffs' lack of knowledge regarding the yield spread differential payment does not necessarily mean that the payment was not made at arms' length. From the undisputed record evidence, it appears that the economic structure of these mortgage transaction is as follows: Princeton has an incentive to ensure that brokers receive full compensation for their services; otherwise, they cannot continue to bring loans to Princeton. Not all borrowers can fully compensate their brokers in cash at closing. Thus, brokers must sometimes look for a source of compensation beyond the borrower's cash payments. Brokers perform different amounts of work for

different borrowers, depending on a variety of case-specific factors. Thus, both the borrower's ability to pay the broker, and the amount of compensation provided by the broker vary significantly from case to case. Princeton's yield spread differential system empowers the broker to choose an interest rate that permits Princeton to pay the broker the present value of the additional payments that the borrower will pay Princeton (or its successors) over the life of the loan. Thus, Princeton allows brokers to set their own compensation, subject to the borrower's refusal take a loan at a higher a rate of interest.[13]

Plaintiffs may wonder how they exercised any control over the yield spread differential payment when they claim not even to have known about it. The yield spread differential, however, was tied directly to the interest rate they agreed to pay on the loan. Plaintiffs were under no obligation to accept the interest rate offered by Princeton. They could have visited a different broker, who might have procured a loan at 8.75% and not charged a higher brokerage fee. Purportedly, plaintiffs chose not to do this because they believed Target's misrepresentation that the 9.5% figure was due to an increase in interest rates. Target's alleged lie, however, should not be imputed to Princeton for purposes of establishing that the yield spread differential did not result from a market transaction. From Princeton's perspective, it set up a mechanism by which the borrower could pay the broker's fees over the life of the loan. Neither the fact that plaintiffs declined to incur further search costs by shopping for a different loan offer, nor the fact that Target's misrepresentation may have left plaintiffs without full information, undermines the integrity of the process structured by Princeton. Even if the yield spread differential compensated Target handsomely, it resulted from a legitimate

market process, and was therefore not unreasonable under § 8 of RESPA.

The only reason this case appears difficult is because plaintiffs allege that they had no knowledge about the way in which Target received compensation. In order to make this market-driven fee seem unreasonable within the meaning of RESPA, plaintiffs must pin on Princeton Target's guilt for allegedly misrepresenting the source of the increase in interest rate. The Court, however, concludes that under the facts of this case the yield spread differential payment resulted from a market transaction legitimately structured by Princeton. Under RESPA, this suffices to establish reasonableness.

### CONCLUSION

Plaintiffs present a compelling case for the institution of a rule that brokers must make borrowers fully aware before accepting yield spread differentials from lenders. The Court, however, must decide a different issue—whether § 8 of RESPA forbids a mortgage lender to pay a mortgage broker a fee when the broker has procured a mortgage loan at a rate above par. Under the facts of this case, the Court concludes that the lender's payment to the broker of a yield spread differential resulted from a legitimately structured market transaction, and therefore that the payment was not unreasonable within the meaning of RESPA. Accordingly, it is

ORDERED AND ADJUDGED that

1. Defendant Princeton Financial Corporation's ("Target") Renewed Motion for Partial Summary Judgment [DE 108] be, and the same is hereby **GRANTED**;

2. Plaintiffs' Third Amended Motion for Class Certification [DE 102] be, and the same is hereby **DENIED**.

13. In some instances, the broker may also provide services to the lender, for which the yield spread differential could be considered compensation. For instance, if the broker performed a title search, which the lender would of course require prior to securing its loan on the subject property, the benefit would redound both to the borrower and to the lender. In such a situation, the broker might chose to recoup the cost directly from the lender through the yield spread differential mechanism rather than from cash-strapped borrower at closing. Thus, yield spread differentials may compensate brokers both for services to the borrower and for services to the lender.