[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

—————————————

No. 97-6109

—————————————

D. C. Docket No. CV 96-H-917-S

JOHN ROBERT CULPEPPER;
PATRICIA STARNES CULPEPPER, in behalf of themselves
and all others similarly situated situated,

Plaintiffs-Appellants,

versus

INLAND MORTGAGE CORPORATION,

Defendant-Appellee.

—————————————

Appeal from the United States District Court
for the Northern District of Alabama

—————————————

(January 9, 1998)

Before EDMONDSON and HULL, Circuit Judges, and CLARK, Senior Circuit Judge.

HULL, Circuit Judge:

This appeal concerns whether a mortgage lender's payment of a "yield spread premium" to

a mortgage broker violates the anti-kickback provision of the Real Estate Settlement Procedures Act,

12 U.S.C. § 2601, et seq. ("RESPA"). The district court granted summary judgment to defendant

Inland Mortgage Corp. and held that the payment it made was not prohibited by RESPA. After

review, we disagree and reverse.[1]

## I. FACTS

### A. The Yield Spread Premium

The pertinent facts are undisputed. John and Patricia Culpepper ("the Culpeppers") obtained a federally insured home mortgage loan from Inland Mortgage Corp. ("Inland"). The Culpeppers did not deal directly with Inland, but dealt with Premiere Mortgage Company ("Premiere"), a mortgage broker.

Inland, like other lenders, sends Premiere daily rate sheets that show the types of loans Inland will make to qualified borrowers. Each type of loan has a bench mark interest rate called the "par rate." This is the lowest interest rate at which Inland will make loans without charging the borrower "discount points." If Premiere as the mortgage broker brings Inland a loan at a "below par rate," then Inland requires Premiere, who then requires the borrower, to pay discount points for the loan. However, if Premiere brings Inland a loan with interest at an "above par rate," then Inland pays a "yield spread premium" to Premiere.

On December 7, 1995, Premiere received a rate sheet from Inland and informed the Culpeppers that a 30-year loan was available at a 7.5% interest rate. The Culpeppers accepted the rate, and Premiere registered the loan with Inland. Unbeknownst to the Culpeppers, the rate sheet showed that 7.5% was higher than Inland's par rate on 30-year loans and carried a yield spread premium of 1.675% of the loan amount, or $1,263.61. Premiere quoted the 7.5% rate notwithstanding the fact that Inland would make the same loan at 7.25%. At that lower interest rate,

---

[1]We review the district court's grant of summary judgment for Inland de novo. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117 (11th Cir. 1993).

the yield spread premium paid to Premiere would be only 0.125% of the loan amount, or $97.20.

When the transaction closed on December 15, 1995, the Culpeppers paid Premiere an origination fee of $760.50 for Premiere's assistance in obtaining and closing their loan. Then, Inland paid Premiere the yield spread premium of $1263.21. The Culpeppers do not challenge the origination fee they paid to Premiere. Rather, their claim focuses solely on the legitimacy of Inland's yield spread premium payment under RESPA.

## B. Calculating The Yield Spread Premium

Inland's formula for determining the size of the yield spread premium was not tied to services, but to the size and interest rate of the Culpeppers' loan. Inland's rate sheet shows that the amount of the yield spread premium was solely a function of the extent to which the interest rate on the loan exceeded Inland's par rate. Indeed, the services provided by Premiere were the same irrespective of the interest rate.

## C. Table Funded Transactions

One final facet of this loan is important to the Court's decision in this case. Although Premiere was the nominal creditor on the loan documents, Premiere did not fund the Culpeppers' loan. Instead, Inland advanced the funds and Premier contemporaneously assigned the loan to Inland. This type of brokerage arrangement is known as "table funding;" thus, Inland, not Premiere, owned the Culpeppers' mortgage from the outset.

## II. DISCUSSION

The narrow issue is whether Inland's payment of a yield spread premium to Premiere for the referral of an above par loan is an illegal fee under RESPA or a valid payment for goods or services.

## A. RESPA's Statutory Framework

In 1974, Congress enacted RESPA to protect home buyers "from unnecessarily high settlement charges caused by certain abusive practices."[2] 12 U.S.C. § 2601(a). Specifically, Congress intended to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." Id. § 2601(b)(2). Toward that end, RESPA prohibits providers of settlement services from paying referral fees and kickbacks, as follows:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

Id. § 2607(a). The funding and origination of mortgage loans were not originally settlement services under RESPA, but a 1992 amendment clarified that such activities were settlement services covered by the statute. Id. § 2602(3).

Although § 2607(a) prohibits referral fees, § 2607(c) exempts payments for goods or services from that prohibition, as follows:

> Nothing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed . . . .

Id. § 2607(c).

## B. Interpretation of RESPA by Courts and Commentators

No circuit court has addressed whether a yield spread premium violates RESPA. Several district courts construed RESPA in similar cases and reached conflicting results. For example, in

---

[2]A "settlement" in this context is simply the process of closing a federally related mortgage loan. 24 C.F.R. § 3500.2(b). A "settlement service" is "any service provided in connection with a prospective or actual settlement." Id.

<u>DuBose v. First Security Savings Bank</u>, 974 F. Supp. 1426 (N.D. Ala. 1997), and <u>Martinez v. Weyerhaeuser Mort. Co.</u>, 959 F. Supp. 1511 (S.D. Fla. 1996), the courts denied the lenders' motions for summary judgment and found that a yield spread premium payment could constitute a prohibited referral fee. Likewise, in <u>Mentecki v. Saxon Mort., Inc.</u>, No.96-1629-A, slip op. (E.D. Va. Jan. 10, 1997), the court denied the lender's motion to dismiss and held that the borrowers stated a claim under RESPA by alleging that the payment of a yield spread premium was an unlawful kickback. On the other hand, in <u>Barbosa v. Target Mortgage Corp.</u>, 968 F. Supp. 1548 (S.D. Fla. 1997), the district court held that a yield spread premium was a lawful payment for services.

In addition, some legal commentators within the lending industry have cautioned that the practice of paying yield spread premiums may be illegal. <u>See</u>, <u>e.g.</u>, Robert M. Jaworski**,** <u>Overages: To Pay or Not To Pay, That is the Question</u>, 113 Banking L. J. 909 (1996) (discussing uncertainty of the propriety of yield spread premium payments under RESPA); Leonard A. Bernstein, <u>RESPA Invades Home Equity, Home Improvement and Mobile Home Financing</u>, 48 Consumer Fin. L. Q. Rep. 194, 197 (1994) (questioning whether "overages" or yield spread premiums can be characterized as permissible payments for services under RESPA).

## C. The Yield Spread Premium Was A Referral Fee Under § 2607(a)

Against this background, our first step is to determine whether the yield spread premium here was a referral fee. Tracking § 2607(a), RESPA is violated if (1) a payment of a thing of value is (2) made pursuant to an agreement to refer settlement business and (3) a referral actually occurs.

Inland gave value to Premiere in the form of the yield spread premium, and that payment was made pursuant to their ongoing contractual relationship, whereby Premiere "registered" loans with Inland and Inland funded those loans. A referral actually occurred when Premiere chose to register

the Culpeppers' loan with Inland and not with the other lenders with whom Premiere did business. These undisputed facts compel the conclusion that Inland's payment of the yield spread premium to Premiere was a referral fee, and thus a violation of RESPA, unless the payment falls within one of the exceptions listed in § 2607(c).

## D. The Yield Spread Premium Was Not a Payment for Goods

As outlined above, § 2607(c) exempts fees for goods or services. The district court deduced that the yield spread premium was payment for a good–i.e., the Culpeppers' loan–that Premiere sold to Inland. However, this deduction ignores the fact that in table-funded transactions the lender, not the broker, owns the loan from the outset. Premiere could not sell the Culpeppers' loan to Inland because Inland already owned it.

RESPA does not prohibit the sale of a mortgage loan in the secondary market. 24 C.F.R. § 3500.5(b)(7). Therefore, if Premiere funds a loan and then sells the loan to Inland for a profit, no RESPA violation occurs. To determine whether an exempt "bona fide transfer of a loan obligation" occurs:

> HUD will consider the real source of funding and the real interest of the funding lender. Mortgage broker transactions that are table-funded are not secondary market transactions.

Id. (emphasis added). Even though the loan documents referred to Premiere as the lender, the parties agree that Inland was the source of the loan funds and was the true funding lender. Consequently, there was no legitimate transfer of ownership of the loan to Inland from Premiere, and the yield spread premium cannot be characterized as a payment for the sale of the loan under RESPA.

Inland concedes that the Culpeppers' loan was table-funded and did not constitute a secondary market transaction. Inland asserts, however, that this fact does not undermine its

6

contention that Premiere owned a valuable asset that it sold to Inland. According to Inland, "Premiere's right to direct the disposition of the mortgage loan [to one of a number of wholesale lenders] is the attribute of 'ownership' that is meaningful in this context." Appellee's Brief, at 22. It is true that Premiere, by virtue of its contract with the Culpeppers, had the right to "direct the disposition" of the loan business to a lender of Premiere's choice. Such a contractual right, however, does not change the fact that Inland violated § 2607(a) by paying Premiere a fee for "directing," i.e., referring, the Culpeppers' business to a particular lender.[3]

## E. The Yield Spread Premium Was Not Payment For Services[4]

Although Premiere provided valuable services to the Culpeppers, the yield spread premium was not payment for those services for two reasons. First, the Culpeppers compensated Premiere by paying a 1% loan origination fee. No evidence suggests that this $760.50 payment was not intended by both Premiere and the Culpeppers to compensate Premiere fully for the work it did for the Culpeppers. Second, Inland stated in response to interrogatories that the yield spread premium "was paid to Premiere Mortgage [in part] for the slightly above-par yield on the mortgage note and [in part] for the right to service the loan." R.1-16, ex. A at 5. This response contradicts the theory that the yield spread premium compensated Premiere for its services to the Culpeppers.[5]

---

[3]If the right to "direct" business constitutes sufficient "ownership" of that business to result in a "sale" of goods, virtually any referral in exchange for a fee could be characterized as an exempt sale of goods under § 2607(c), and RESPA's prohibition against referral fees would be nullified.

[4]On summary judgment, Inland argued that the yield spread premium was either a payment for goods or a payment for services. The district court did not reach the services argument, but Inland raises it on appeal as an alternative basis for upholding the district court's ruling.

[5]Mortgage transactions are structured in a variety of ways, and the holding here is highly dependent upon the facts of this financial transaction. We simply note that the particular facts

7

Similarly, the yield spread premium was not compensation for Premiere's providing services to Inland. In addition to the above interrogatory response, it is undisputed that the payment of the yield spread premium was not tied to the quantity or quality of the services that Premiere provided. Rather, the sole determinant of whether a yield spread premium would be paid was the interest rate on the loan. Stated another way, Premiere expends the same amount of effort and provides the same quality and quantity of services whether it originates an above par loan, a par loan, or a below par loan. Because Premiere receives a yield spread premium only when it originates an above par loan, the premium cannot be characterized as payment for originating the loan.

Based on the undisputed evidence, the only "service" for which the yield spread premium was compensation was Premiere's "service" of referring an above par loan to Inland. However, referring loan business, even valuable business, is not a service for which RESPA permits payment. The yield spread premium payment thus violated RESPA.

## F. RESPA's Market Value Test Is Inapplicable

RESPA's implementing regulations provide a test to determine whether a payment for a good or service is so excessive that part of the payment actually may constitute a prohibited referral fee.[6] Citing this test, the district court found that the payment Inland made to Premiere was a fair market price for the Culpeppers' loan and thus concluded that there was "no 'excess' payment left to be attributed to a 'referral fee.'" Culpepper v. Inland Mort. Corp., 953 F. Supp. 367, 372 (N.D. Ala.

---

here do not support the conclusion that the yield spread premium in this case was paid as compensation for the services Premiere provided to the Culpeppers.

[6]The regulation states: "If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided." 24 C.F.R. § 3500.14(g)(2).

8

1997). This conclusion ignores the fact that the payment did not compensate Inland for any good or service. The market value test is useful only if the payment is for a good or service in the first instance and a determination must be made whether the payment is so excessive that the excess should be characterized as a referral fee. Here, Inland paid Premiere only for the referral of the loan. Thus, the market value test is inapplicable.

Inland stresses that market forces drive the size of yield spread premiums. This fact does not affect our analysis because the size of kickbacks and referral fees often is shaped by the value of the referred business. A market driven referral fee is still a referral fee prohibited by RESPA.

## G. Denial of Class Certification

Pursuant to Inland's request, the district court delayed consideration of the class certification issue until after resolving the motion for summary judgment. Having granted summary judgment in Inland's favor, the district court dismissed the class allegations without prejudice and denied the Culpeppers' motion for class certification without reaching the merits under Federal Rule of Civil Procedure 23. In light of our above reversal, we vacate the district court's denial of the motion for class certification and dismissal of the class claims and remand so that the district court can consider these issues ab initio.

## III. CONCLUSION

Under the particular facts here, the yield spread premium Inland paid to Premiere was a prohibited referral fee under RESPA. Therefore, we REVERSE the district court's grant of summary judgment for Inland and REMAND for further proceedings consistent with this opinion. We also VACATE the district court's dismissal of the class claims and denial of class certification and REMAND for consideration under Rule 23.