**C.H. DUBOSE and Betty Dubose on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**FIRST SECURITY SAVINGS BANK, et al., Defendants.**

Civil Action No. 95–D–867–N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 13, 1997.

C. Knox McLaney, III, Angela L. Kimbrough, Montgomery, AL, Louis C. Rutland, Union Springs, AL, James O. Latturner, Chicago, IL, Cathleen M. Combs, Daniel A. Edelman, Chicago, IL, for Plaintiffs.

Dennis R. Bailey, Nathan Wayne Simms, Jr., Montgomery, AL, C. William Gladden, Jr., Birmingham, AL, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Pending before the Court are defendant Flagstar Bank's ("Flagstar") f/k/a First Security Savings Bank motions for full and/or partial summary judgment. The issues have been fully briefed and are amenable to disposition. After carefully considering the arguments of counsel, the relevant case law and the record as a whole the Court finds that Flagstar's motions are due to be granted in part and denied in part.

## JURISDICTION

The Court has jurisdiction pursuant to 12 U.S.C. § 2607 and 28 U.S.C. § 1331 (federal question jurisdiction). The parties do not contest personal jurisdiction or venue.

## BACKGROUND

This case is one of a number of cases filed throughout the country that challenge a banking and mortgage industry practice known as "par-plus pricing." Basically, "par-plus pricing" or "yield-spread premiums" are payments made by a financial institution to a mortgage broker in return for the broker selling a mortgage at an interest rate which is above "par." Plaintiffs contend that these payments are illegal kickbacks or unearned fees prohibited under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.

The facts of this case are not complicated. On November 11, 1994, plaintiffs took out a mortgage to refinance their home. The mortgage had a term of 15 years and bore an interest rate of 8.75%. The nominal creditor on the loan was defendant Homeowner's Financial Services ("HOFS") but in fact, HOFS was merely a mortgage broker. The real source of the loan was Flagstar. Flagstar and HOFS had entered an agreement whereby Flagstar agreed to fund loans made by HOFS in exchange for HOFS' promise to assign, upon closing, all of its rights and interest in the mortgage to Flagstar. This practice is known in the banking industry as "table funding."

Upon closing, plaintiffs received what is known as a "HUD–1 Settlement Statement" which detailed all the costs and fees associated with the mortgage loan. The HUD–1 Settlement Statement revealed that plaintiffs paid HOFS a loan origination fee of $616.00 (2% of the mortgage principal), a loan discount fee of $616.00 and a tax service fee of $67.00. Additionally, the Settlement Statement showed that a fee of $269.50 was paid to HOFS by Flagstar for "Par Plus Pricing."

Plaintiffs filed their six-count complaint on June 23, 1995. In Count I, plaintiffs claim that defendants violated 12 U.S.C. § 2607 and Regulation X of RESPA by charging and/or receiving fees for settlement services that were duplicative, were not provided or were in fact prohibited referral fees. In Count II, plaintiffs claim defendants' conduct violated the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). In Count III, plaintiffs contend Flagstar fraudulently induced plaintiffs to obtain a mortgage at an interest rate above that which they could have otherwise obtained. In Count IV, plaintiffs contend Flagstar intentionally interfered with the contract between plaintiffs and HOFS by

inducing HOFS to obtain for plaintiffs a mortgage which carried an inflated rate of interest. In Count V, plaintiffs contend that Flagstar's conduct induced HOFS to breach its fiduciary duty to the plaintiffs. And, finally, in Count VI, plaintiffs assert that Flagstar and HOFS committed fraud by representing that they were imposing legitimate charges on plaintiffs in connection with the mortgage closing when, in fact, the charges were for services not performed or for nonexistent services.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510;

see also *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553; see also Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*; see also *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

## DISCUSSION

### A. Count I–RESPA

Finding that "consumers throughout the Nation" were in need of "greater and more timely information on the nature and costs of the settlement process and [protection] from unnecessarily high settlement charges," Congress, in 1974, enacted the Real Estate Settlement Procedures Act. 12 U.S.C. § 2601(a). In addition to mandating the uniform and straightforward disclosure of costs and fees appurtenant to mortgage closures, Congress identified two types of fees which were con-

tributing to the problem of "unnecessarily high settlement charges." These fees, business referrals and splitting charges, have been made the subject of substantive prohibitions.

Section 2607(a) of RESPA provides:

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

The Housing and Urban Development ("HUD") Agency has promulgated regulations which help "fill out" this prohibition. Significantly, a "settlement service" includes the "origination of a federally related mortgage loan" as well as the "rendering of services by a mortgage broker (including counseling, taking of applications, obtaining verifications and appraisals ... )." 24 C.F.R. § 3500.2(b). HUD defines a "referral" as:

any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business.

*Id.* at § 3500.14(f)(1). Applied to the facts of the instant case, § 2607(a) prohibits Flagstar from paying HOFS for the "referral" of "settlement service" business. *See id.* at § 3500.14(b).

RESPA's prohibition against splitting charges is contained in § 2607(b):

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

The HUD regulations explain:

A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section.

The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this Part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

24 C.F.R. § 3500.14(c). Thus, it appears that § 2607(b) prohibits Flagstar from charging, and HOFS from accepting, fees for nominal or non-existent services.

Flagstar, however, contends that the yield-spread premium it paid to HOFS was payment for the release of the servicing rights to plaintiffs' loan. Flagstar argues that, as such, the yield-spread premium represents compensation for a good or service actually furnished and that such payment is permitted under § 2607(c). This section provides in relevant part:

Nothing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.

12 U.S.C. § 2607(c)(2). The regulations help identify "goods ... actually furnished" and "services actually performed":

If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, the excess is not for services or goods actually performed or provided.

24 C.F.R. § 3500.14(g)(2).

Flagstar's characterization of the yield-spread premium it paid to HOFS is called into question by three things. First, plaintiffs have submitted numerous articles from the banking and mortgage industries, each of which defines par-plus pricing or yield-spread premiums as a payment made by a financial institution to a mortgage broker in return for the broker securing a mortgage at an interest rate above the lowest interest rate at which the financial institution would be willing to finance the mortgage. It strikes the Court as odd that Flagstar, a large financial institution active in the mortgage industry, would use a term such as "par-plus pricing" to mean something wholly different than that which is commonly understood throughout the industry.

Second, the agreement between Flagstar and HOFS provides that, upon closing, HOFS shall assign its interest in the mortgage and note to Flagstar. In exchange, Flagstar agrees to fund or underwrite the mortgage. The agreement makes no mention of an interest in servicing rights which is separate from the note and mortgage nor does the agreement make provision for the sale of those rights, if they separately exist. Finally, Flagstar's expert witness, John A. Venable, states: "In connection with the DuBose loan, [Flagstar] did pay to the broker in the transaction [HOFS], the amount of $269.50 primarily as a fee for purchasing the rights to service this loan **and partially due to selection of an interest rate above par.**" Venable Aff. ¶ 4 (emphasis added). Thus, at a minimum, there exists a question of fact as to whether all or a portion of the par-plus pricing paid to HOFS was for something other than the rights to service plaintiffs' mortgage.

The Court must next turn to the question of whether Flagstar's payment of a premium to HOFS for brokering a mortgage at an interest rate above par violates any provision of RESPA. To date, only two courts have reached the merits of this issue. In *Culpepper v. Inland Mortgage Corp.*, 953 F.Supp. 367 (N.D.Ala.1997), the court considered whether a financial institution's payment of a yield-spread premium to a mortgage broker violated RESPA's § 2607(a) prohibition against referral fees. The court found that the payment was payment for an asset (the mortgage) actually furnished and, therefore, was permitted under § 2607(c). The court reasoned that because the yield-spread premium was set by free market forces, the test set forth in 24 C.F.R. § 3500.14(g)(2) for identifying a payment for goods actually provided was satisfied. *Id.* at 371–72.

In *Barbosa v. Target Mortgage Corp.*, 968 F.Supp. 1548 (S.D.Fla.1997), the court was asked to decide whether the payment of a yield-spread premium violated either § 2607(a)'s prohibition on referral fees or § 2607(b)'s ban on "fee splitting." With respect to § 2607(a), the court agreed with the *Culpepper* Court that the payment of a yield-spread premium was not a prohibited "referral fee," but appeared to reach this conclusion for different reasons. *Id.* at 1556–57.

First, the court found that the yield-spread premium was "paid for [the broker's] procurement of a loan at a percentage rate over par, not for the mere referral of business." *Id.* Second, the court found that the broker was paid a yield-spread premium, not for the referral of business, but for procuring a loan at an above-par interest rate and thereby relieving the borrower's obligation to pay the broker up-front for the full value of his or her services. *Id.* at 1557–58.

Turning to the issue of "fee splitting," the *Barbosa* Court found that because the yield-spread premium was derived from interest payments made by the borrowers, in effect, the mortgage broker and the lender could be considered to have "split" fees. *Id.* at 1558–59. The court then considered whether the fees split were for "the rendering of a real estate settlement service ... other than for services actually performed." 12 U.S.C. § 2607(b). Finding that plaintiff had adduced no proof that the yield-spread premium did not "bear[ ][a] reasonable relationship to the market value of the goods or services provided," 24 C.F.R. § 3500.14(g)(2), the court concluded that they were not. *Barbosa*, 968 F.Supp. at 1560–63. In so finding, the court rejected plaintiff's contention that a discrepancy between the settlement fees paid by the plaintiff and the national average for those fees could establish that the settlement fees paid by plaintiff were higher than their market value. *Id.* at 1561–63.

One other court, while not yet reaching a final decision on the issue, has expressed doubt that a yield-spread premium can constitute a payment for goods or services actually provided. In *Mentecki v. Saxon Mortgage*, No. Civ. A. 96–1629–A, 1997 WL 45088 (E.D.Va. Jan.10, 1997), the court stated:

By their very nature, yield spread premiums are not compensation given for services actually performed by the broker. The reality of the transaction is that the broker benefits by payment of the premium, the lender benefits by obtaining a higher than par loan, and the borrower pays. Quite simply, the premium rewards the broker for referring the above-par loan. The court is unable to see what service is provided to the consumer, as it must under section 2607(c)(1)(C) or (c)(2), unless it is the provision of a bad deal.

Nor can the premium be defended as compensating the broker where the broker has already charged the borrower directly for all services provided.

*Id.* at *4 (footnote omitted).

Against this backdrop, the Court considers plaintiffs' claim that the imposition of yield-spread premiums violates RESPA. In their complaint, plaintiffs do not specify which provision of RESPA has been violated, but from a review of the briefs and evidentiary materials plaintiffs have submitted, it is apparent that they contend that defendants' conduct violates both § 2607(a) and (b).

■ Section 2607(a) prohibits the payment of referral fees. Thus, the question is, was Flagstar's payment of $269.50, ostensibly for par-plus pricing, a referral fee? The *Culpepper* Court said, "No," this was "a market-driven purchase price that [the financial institution] paid for the [borrowers'] loan." 953 F.Supp. at 371. This analysis, however, glosses over the nature of the transaction between the mortgage broker and the financial institution. With a "table-funded" mortgage, it is the financial institution, not the broker, which has an ownership interest in the mortgage from the outset. HUD recognized this fact and specifically excluded table-funded mortgage broker transactions from its definition of a "secondary market transaction." 24 C.F.R. § 3500.5(b)(7).[1] While market forces may indeed determine the amount of the yield-spread premium paid by a bank to a mortgage broker, in a table-funded transaction, that payment is not for the "purchase" of the mortgage; in substance, the bank "owns" the mortgage all along. In such a case, there is no legitimate "sale" and "purchase" of the mortgage and, therefore, the Court finds the *Culpepper* Court's reasoning unpersuasive.

The *Barbosa* Court also concluded that the payment of a yield-spread premium was not a referral fee. The *Barbosa* Court's first reason for this conclusion was that the yield spread premium was paid not for the mere referral of business, but instead for the pro-

curement of a mortgage at an above-par interest rate. 968 F.Supp. at 1557–58. However, the procurement of such a loan has no value to the bank in the abstract. That is, if HOFS procured an above-par mortgage for a bank other than Flagstar, it is certain that Flagstar would not pay HOFS a yield-spread premium. It is only for the **referral** of a mortgage with an above-par interest rate that Flagstar is willing to pay HOFS a yield-spread premium.

Alternatively, the *Barbosa* Court found that the yield-spread premium was payment for the broker's procurement of an above-par mortgage which effectively reduced the borrower's need to produce up-front cash. *Id.* In other words, the yield-spread premium was in effect financial assistance to the borrower rather than a referral fee paid to mortgage broker. While that may have been the case in *Barbosa*, there is simply no evidence to support a similar conclusion here. Neither Flagstar nor HOFS has adduced evidence which demonstrates that the $269.50 par-plus pricing paid by Flagstar to HOFS offset the cost of the services HOFS provided plaintiffs. The record indicates that plaintiffs paid HOFS a 2% loan origination fee. In the absence of evidence to the contrary, the Court is unwilling to assume that this fee does not represent full compensation for HOFS' services. Accordingly, the Court is not persuaded by the *Barbosa* Court's rationale.

It is true that plaintiffs have offered no evidence that conclusively demonstrates that the $269.50 paid by Flagstar to HOFS was a referral fee. Reasonable minds could, however, conclude that that is exactly what the yield-spread premium represented. "A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service." 24 C.F.R. § 3500.14(f)(1). Here, Flagstar let HOFS know that if HOFS procured an above-par loan for Flagstar, Flagstar would pay HOFS a fee.[2] Clearly, this is an action

---

**1.** An example of a secondary market transaction would be Flagstar's sale of the plaintiffs' mortgage to FNMA. Secondary market transactions are specifically exempted from RESPA's coverage. 24 C.F.R. § 3500.5(b)(7). Therefore, it would be perfectly legitimate for FNMA to pay

Flagstar a premium for a mortgage with an above-par interest rate.

**2.** Flagstar issues a daily "rate sheet" to mortgage brokers which sets forth the amount of the yield-spread premium Flagstar will pay a broker for

which could be interpreted as an attempt to influence HOFS to make loans on behalf of Flagstar.[3] Therefore, there exists a material fact question as to whether the par-plus pricing Flagstar paid HOFS was a prohibited referral fee.

■ The Court finds that the payment of par-plus pricing may also violate § 2607(b). Section 2607(b) forbids the splitting of settlement service fees for services which are duplicative or not actually performed. 24 C.F.R. § 3500.14(c). The *Barbosa* Court found that because yield-spread premiums may be funded by the increased interest which borrowers pay on above-par mortgages, in effect, the mortgage broker and lender "split" fees paid by the borrower. 968 F.Supp. at 1557–59. The Court agrees with this portion of the *Barbosa* Court's reasoning and finds that Flagstar and HOFS have "split" charges imposed on the plaintiffs. The *Barbosa* Court went on to find that these charges were payment for the settlement services the mortgage broker provided the borrower. *Id.* at 1560–63. Here, however, defendants do not claim that the par-plus pricing was compensation for the settlement services HOFS provided plaintiffs. Nor have defendants produced any evidence that suggests this to be the case. The defendants' claim is that the par-plus pricing was a service release fee. But, as discussed above, this explanation has been called into question by the evidence in the record. Therefore, drawing all reasonable factual inferences in favor of the plaintiffs, the Court finds a material issue of fact as to whether Flagstar and HOFS split fees for duplicative or non-existent settlement services in violation of § 2607(b). Accordingly, the Court finds that Flagstar's motion for summary judgment on Count I is due to be denied.

### B. Counts II–V

■ Plaintiffs' claims in Counts II through V are identical to the plaintiffs' claims in *Briggs v. Countrywide Funding Corp.,* 949 F.Supp. 812 (1995). In *Briggs,* the Court dismissed plaintiffs' state law claims prem-ised on the non-disclosure of defendants' alleged scheme to induce, through the payment of yield-spread premiums, mortgage brokers to sell above-par loans. *Briggs,* 949 F.Supp. 812, 815 (M.D.Ala.1996). The Court found that under Ala.Code § 5–19–6(c), defendants had no duty to make such a disclosure. *Id.* at 814–15. Because plaintiffs' civil RICO claim was based upon these state-law fraud allegations, the Court found that it too was due to be dismissed. *Id.* at 815. Consistent with the Court's findings in *Briggs, supra,* the Court finds that Counts II through V of plaintiffs' complaint are due to be dismissed.

### C. Count VI–Misrepresentation

■ In Count VI plaintiffs contend that Flagstar and HOFS falsely represented to plaintiffs that all of the settlement fees imposed on plaintiffs were for actual and necessary services when, in fact, they were not. The Court has already found that there exists a question of material fact as to whether defendants charged plaintiffs for duplicative or non-existent services. *See supra* Part A. Accordingly, the Court finds that defendants' motion for summary judgment as to Count VI is due to be denied.

### *ORDER*

For the reasons set forth above, it is CONSIDERED and ORDERED that defendants' motion for summary judgment:

(1) with respect to Count I is hereby DENIED;

(2) with respect to Counts II, III, IV, and V is hereby GRANTED; and

(3) with respect to Count VI is hereby DENIED.

---

the origination of a mortgage loan at any given interest rate. *See* Ex. B attached to Defs.' Mot. for Summ. J.

3. The origination of a mortgage loan is included within the definition of a settlement service. *See* 24 C.F.R. § 3500.2(b).