**Margaret McWHORTER, Plaintiff,**

**v.**

**FORD CONSUMER FINANCE COMPANY, INC., et al., Defendants.**

**No. CIV. A. 1:96–CV–0572–JOF.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 4, 1997.

William J. Brennan, Jr., Karen Elizabeth Brown, Atlanta Legal Aid Society, Decatur, Joseph H. King, Jr., Atlanta, GA, for Plaintiff.

Mary Grace Diehl, Amy Stutz Lettes, Troutman Sanders, Gary E. Massafra, Atlanta, GA, for Defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court on Plaintiff's motion for summary judgment [25–1] and Defendant Ford's motion for summary judgment [27–1].

In her complaint, Plaintiff alleges that Defendant Ford Consumer Finance Co., Inc., and Defendant B & H Credit Services, Inc., violated the Federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.* (1974), and its implementing regulations, Regulation X, 24 C.F.R. § 3500.1, *et seq.* Plaintiff also brings state law claims against Defendant B & H for breach of fiduciary duty and fraud and state law claims against Defendant Ford for international interference with a contractual relationship, fraud, and unjust enrichment.

## I. UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Margaret McWhorter is a 64–year–old widow who owns and resides at her home in Atlanta, Georgia. Defendant Ford Consumer Finance Co., Inc. ("Ford"), is a New York corporation in the business of making residential mortgage loans. Defendant Ford regularly transacts business in the state of Georgia. Ida Michelle Ward ("Ward"), formerly known as Ida Michelle Herbert, was a licensed mortgage broker during all times relevant to this case, doing business as B & H Credit Services, Inc. ("B & H"). As a mortgage broker, she conducted business as a referral mortgage broker and provided real estate settlement services. A mortgage broker who performs such services is referred to in the industry as a "referral broker" or a "retail broker."

### B. *Defendant Ford's Lending System in Georgia*

Much of Defendant Ford's mortgage lending, such as the loan made to Plaintiff, is in what is known as the "sub-prime," "non-conforming," or "B/C" credit market. In this market, Ford provides credit to individuals who have a higher credit risk due to past credit problems such as bankruptcies, foreclosures, late payments, and judgments. Although Ford maintains a "direct sales office" in Dallas, Texas, it does not maintain retail or branch operations in Atlanta, Georgia, where borrowers may come in and apply for loans. Defendant Ford instead makes loans in Georgia through a network of approved independent mortgage brokers.

In Georgia, at the time relevant to this action, Defendant Ford had two broker programs, Program I and Program II, that were available to all brokers who did business with it. Brokers had to elect participation in one of the programs for an extended period of time and could not change on a loan-by-loan basis. Brokers who chose to participate in Program I received no fee from Defendant Ford, but they were free to contract with their customers, the borrowers, for a broker free and receive whatever compensation they agreed to directly from them out of the loan proceeds. Brokers who participated in Program II were paid a sum equal to 4% of the net loan amount from Ford and were also able to contract with their customers (the borrowers) for a broker fee. The 4% fee paid by Ford to Program II brokers was POC (paid outside closing) and did not come

out of any loan proceeds received by the borrower. Furthermore, the 4% rate was non-negotiable or adjustable.

Interest rates on the loans given to customers of Program I brokers were uniformly one percentage point less than interest rates charged to Program II broker customers in the same credit class. Otherwise, the loan rates within each Program were determined by the borrowers' credit classifications, which took into account their credit history and financial situation. If a Program II loan went for its full term, the one percentage point of higher interest charged to Program II loans over corresponding Program I loans was equivalent to the 4% fee that Defendant Ford paid to brokers and therefore reimbursed Ford for that fee. This 4% fee was paid to Program II brokers only if the loan was closed. It was not paid to the broker if the loan did not close or if it was later canceled within three days of closing.

Defendant Ford maintained the two programs in Georgia in order to include the full spectrum of brokers in its lending operations. At all times relevant to this action, Defendant Ford employed account executives whose job it was to call mortgage brokers throughout the state soliciting Ford's products and services in an attempt to have the brokers refer loan applications to Ford for approval and funding. These executives worked with a network of mortgage brokers. Michael Armstrong was the exclusive Ford executive who dealt with B & H. In order to solicit business, Armstrong visited brokers as often as 100–120 times a month, four to five times a day. As part of his job, he informed brokers, including Ward, of Ford's products, services and Programs. He also gave copies of Defendant's rate sheets to the brokers. B & H chose to be a Program II broker. In fact, a majority of brokers elected to participate in Program II.

On August 3, 1994 Defendants Ford and B & H entered into an agreement. From January 1, 1995 to July 31, 1996 B & H received fees in connection with approximately 35 loans funded by Ford. Defendant Ford requires mortgage brokers to submit to it a copy of the written agreement that the broker has with the prospective borrower. As part of its broker's file, Defendant Ford already had a copy of B & H's form agreement entitled "Agreement for Financial Service," which provides that B & H will serve as the borrower's agent. Defendant Ford required that a copy of this written agreement be provided to Plaintiff. B & H provided this form, the same that was already in Ford's files, to Ford. Effuah Chisholm, loan processor at Ford, received the document but did not read it.

### C. *Plaintiff's Loan*

In early 1995 in response to an advertisement, Plaintiff contacted B & H to arrange for a loan to pay off her personal debt. At B & H, she met Ward. On February 3, 1995, Plaintiff entered into a written agreement with B & H. Pursuant to the agreement, B & H was to provide mortgage broker services in connection with obtaining a loan for Plaintiff, and Plaintiff agreed to pay to B & H a 4% commission out of the proceeds of the loan. (See Plaintiff's Motion for Summary Judgment, Exhibit 8, Agreement for Financial Services).

Ward told Plaintiff that she would help her to get a loan and would try to find the best one that she could. She also counseled Plaintiff on her loan options. However, Ward did not inform Plaintiff that she was a Program II broker when dealing with Ford, that Ford also had Program I brokers, or that Program II loan interest rates were one percentage point higher than corresponding loan rates offered under Program I.

Plaintiff provided to Ward information and paperwork relevant to her mortgage loan application. Plaintiff's application reflected certain credit problems, including a judgment lien on her home from an unpaid automobile loan and back property taxes. Her income was also limited to Social Security benefits, a small pension, and earnings from part-time employment at a day care center. After receiving information from Plaintiff, Defendant B & H verified Plaintiff's employment and current income, obtained a credit report and payoff information for the first mortgage and back property taxes, and arranged an appraisal of the property. Defendant B & H also arranged for a closing attorney, was

present at the closing, and prepared a good faith estimate for Plaintiff. Defendant B & H then submitted the loan package to Defendant Ford.

Ford's loan processor, Effuah Chisholm, reviewed the loan application and supporting documentation, verified some information, and submitted the materials to Ford's main office in Dallas, Texas. B & H later provided some additional documentation to Ford at Ford's request. Defendant Ford initially denied Plaintiff's loan application, but after an appeal by the regional office, the loan was eventually approved. The final loan provided Plaintiff with lower payments than her monthly mortgage payments had been.

On February 3, 1996, B & H prepared a document entitled Good Faith Estimate. This document included, in part, the following information:

| | | |
|---|---|---|
| 801. | Loan Origination Fee 4 pts + $150 | $1150 |
| .... | | |
| Misc. | Yield spread premium (if known) P.O.C. | $____ |

(Plaintiff's Motion for Summary Judgment, Exhibit 11, Good Faith Estimate). The document did not disclose that B & H would receive from Defendant Ford or any other lender any fee, kickback or other value. The document stated that "... no lender had been obtained ..." and that "[a] lender will provide you with an additional Good Faith Estimate within three business days of the receipt of your loan application." (*Id.*).

On February 6, 1995 Defendant Ford prepared a document entitled "Good Faith Estimate of Settlement Costs" and sent it by facsimile to B & H. That document included, in part, the following information:

| | | |
|---|---|---|
| 808 | BROKER FEE PAID BY BORROWER OUT OF LOAN PROCEEDS | $1,350.00 |
| .... | | |
| 813 | BROKER FEE PAID BY FCF OUTSIDE OF CLOSING TO B & H CREDIT SERVICES FOR OUTSIDE SERVICES RENDERED | $1,350.00 p.o.c. |

(Plaintiff's Motion for Summary Judgment, Exhibit 13, Good Faith Estimate of Settlement Costs).

On March 6, 1995 Defendant Ford closed its loan to Plaintiff. At the closing, Plaintiff executed loan documents, including a note and a deed to secure debt. The principal amount of the loan was $30,594.69, with an interest rate of 15.35% and a twelve-month introductory interest rate of 13.6%. (Plaintiff's Motion for Summary Judgment, Exhibit 15, Note). During the first twelve months, the monthly payments were $353.76. The monthly payments then increased to $395.87 for the next 167 months. At the end of the fifteen-year period, there is a final balloon payment due of $27,597.61.

At the loan closing, Defendant Ford presented Plaintiff with an approved HUD-1 Settlement Statement which identified and itemized the settlement charges and creditors who were paid as a result of the loan transaction and set forth the terms of the loan. (Plaintiff's Motion for Summary Judgment, Exhibit 17, Settlement Statement). The form disclosed that B & H received fees in the amount of $2,302.90. According to the form, this amount was composed of:

808. YIELD SPREAD PAID TO B & H CREDIT SER. BY FCFC POC 1151.45

809. FOR SERVICE RENDERED

810. BROKER FEE B & H CREDIT SERVICES $1,151.45

---

(*Id.*). At the closing, Plaintiff executed the loan documents, including the HUD–1 Settlement Statement. After the three-day rescission period following the closing, Defendant Ford funded the loan and Plaintiff received $778.72, as well as $18,541.03 to pay off her mortgage, $6,555.61 to pay off a judgment lien, and $1322.69 to pay off some past due real estate taxes.

In connection with Plaintiff's loan transaction, Defendant B & H received a fee of 8% of the net loan amount for a total of $2,302.90. This amount was composed of the 4% that Plaintiff paid directly to B & H out of the loan proceeds and the 4% that Ford paid to B & H as a Program II broker.

## II. DISCUSSION

### A. Plaintiff and Defendant Ford's Cross–Motions for Summary Judgment

This court heard oral arguments in this matter on June 4, 1997. At the start of the hearing, the court indicated that Defendant B & H was not represented and had not responded to Plaintiff's motion for summary judgment or received notice of the hearing. (*See* Transcript of Hearing held on June 4, 1997 at 5). At the close of the hearing, the court granted Defendant Ford's motion for summary judgment on Plaintiff's fraud and unjust enrichment claims. (*Id.* at 58–59). At that time, the court took the other claims under advisement. (*Id.* at 5).

### 1. RESPA Claims

Plaintiff brings several claims under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.* Congress enacted RESPA in 1974 in order to provide consumers with more information about the nature and costs of the settlement

process and to protect them from unnecessarily high and abusive settlement charges. *Id.* at § 2601. Accordingly, RESPA regulates the provision of real estate "settlement services," which are defined as "any service[s] provided in connection with a real estate settlement, including, but not limited to ... the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans...." 12 U.S.C. § 2602(3)).

### a. 12 U.S.C. § 2604

 In Count I of her amended complaint, Plaintiff alleges that Defendants violated section five of RESPA and its implementing regulations [1] by failing to provide her with "a good faith estimate of the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement." 12 U.S.C. § 2604(c); 24 C.F.R. § 3500.7. Defendant moves for summary judgment on the grounds that there is no private right of action to enforce this section of RESPA.

After Defendant Ford's motion for summary judgment was filed, the Eleventh Circuit held that there is no private civil action for a violation of 12 U.S.C. § 2604(c) or any regulations relating to it. *See Collins v. FMHA–USDA*, 105 F.3d 1366, 1368 (11th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997). As a result of this holding, Defendant Ford's motion for summary judgment on this claim is GRANTED.

### b. 12 U.S.C. § 2607(a)

In Count I of her amended complaint, Plaintiff alleges that Defendants violated sec-

---

**1.** Congress authorized HUD to issue necessary rules, regulations, and interpretations in order to implement RESPA in 12 U.S.C. § 2617(a).

tion 2607(a) of RESPA when Ford paid B & H a 4% fee in the amount of $1,151.45 as a kickback for referring Plaintiff's loan. Defendant Ford claims that the 4% fee was reasonable compensation for services actually rendered and, therefore, was not an illegal fee barred by RESPA.

In order to reduce the "unnecessarily high" costs of settlement services, Congress sought to eliminate the practice of kickbacks and referral fees being paid for the referral of business. *See* 12 U.S.C. § 2601(b)(2).[2] Section 2607(a) of RESPA accordingly provides:

> [n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

This prohibition on referral fees is also contained in the implementing regulations issued by the Department of Housing and Urban Development ("HUD"). *See* Regulation X, 24 C.F.R. § 3500.14(b). These regulations further provide that a referral agreement:

> need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

24 C.F.R. § 3500.14(e). Congress, however, wrote an exception into RESPA to provide for legitimate, compensatory payments to mortgage brokers. In relevant part, RESPA states that "... the payment to any person of ... compensation or other payment for goods or facilities actually furnished or for services actually performed" is a legitimate payment that is not barred by the statute. 12 U.S.C. § 2607(c)(2). Regulation X furnishes additional guidance on the meaning of this exception when it ties the determination of whether a payment is actually for services performed to the market value of those services. Stating that "[h]igh prices standing alone are not proof of a RESPA violation ...," Regulation X provides that "[i]f the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, the excess is not for services or goods actually performed or provided." 24 C.F.R. § 3500.14(g)(2).[3]

### (1) *Parties' Arguments*

Plaintiff argues on a systemic level that Defendant Ford's Program I and Program II broker structure is designed to operate as an incentive for brokers to refer borrowers to Ford. Since every borrower brought to Ford by a Program II broker would be offered a loan at a one percent higher interest rate than a borrower brought by a Program II broker, Plaintiff contends that Ford offered the "hidden" 4% fee to Program II brokers to induce them to bring borrowers to Ford under the higher rate. Plaintiff contends that the whole Program I/Program II system was a sham because brokers performed the same services regardless of their program affiliation. Plaintiff also argues that the 4% fee paid to B & H was an illegal fee because: (1) it was a sum that was dependent only on the value of the loan; (2) the fee was only paid if the loan was closed and was not canceled within three business days; (3) the fee was not tied to how much time a broker spent on a loan; (5) the 4% amount was identified by Defendant Ford as a yield spread for services rendered on the forms at

**2.** The legislative history details some of the abuses that RESPA was aimed at preventing. These abuses include the payment of a 10% fee by a title insurance company to an attorney who did nothing more than place a call to the company or fill out a simple application and the payment by an attorney, of part of his fee to a lender for merely referring a potential client to him. *See* S.Rep. No. 93–866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551. In such situations, the payment of the unearned fee does nothing for the home buyer (or borrower) except increase the settlement costs. *Id.*

**3.** Recognizing this exception in RESPA, the Senate Report warns that "[t]hose persons or companies that provide settlement services should therefore take measures to ensure that any payment they make or commissions they give are not out of line with the reasonable value of the services received." S.Rep. No. 93–866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546.

closing, and a yield spread is an industry term, according to Plaintiff, that refers to when a broker arranges a loan with a consumer for a higher interest rate than the minimum standard one; and (5) there is no evidence of any specific services that Program II brokers have to provide in order to receive the 4% fee.

Defendant Ford argues that it is entitled to summary judgment for several reasons. First, it contends that Plaintiff does not have standing to bring her claim because she was not a person "charged for the settlement service involved in the violation." Second, it asserts that Plaintiff has failed to produce evidence that the fee was not for "services actually rendered." Defendant argues that Program II brokers were relied upon to perform a full range of settlement services for their fee, and that Ford would have had to provide those services if the broker failed to perform them. Defendant contends that Plaintiff has admitted that B & H was a mortgage broker who contracted to find her a loan, took her loan application, successfully obtained a loan from her, and provided an estimate of closing costs to her and that she therefore cannot deny that services were actually performed by B & H. Furthermore, Defendant argues that the undisputed evidence indicates that the total amount paid to B & H by Ford and Plaintiff, 8% of the net loan value, was a reasonable market rate for the settlement services that were performed. As a result, Defendant asserts that there is no evidence that the payment from Ford was anything other than compensation for services actually performed.

### (2) Legal Background

The court notes that there have been several other district court opinions recently construing RESPA's prohibition on referral fees and kickbacks as applied to various fees paid by lenders to brokers. *See Dubose v. First Security Savings Bank*, 974 F.Supp. 1426, (M.D.Ala.1997); *Culpepper v. Inland Mortgage Corp.*, 953 F.Supp. 367 (N.D.Ala. 1997); *Barbosa v. Target Mortgage Corp.*, 968 F.Supp. 1548 (S.D.Fla.1997); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F.Supp. 1511, 1520–21 (S.D.Fla.1996). Although none of these cases deals with situations where loan interest rates and broker compensation are set by separate "programs" like the instant case, the court finds the analyses of several of these courts instructive.

In *Culpepper*, the plaintiffs filed a complaint against their lender alleging that it had illegally paid a referral fee to their mortgage broker to induce their broker to bring the loan to it for funding. *Culpepper*, 953 F.Supp. at 371. The plaintiffs paid their broker a 1% loan origination fee, and they later discovered that their broker had also received a $1263.61 "yield spread premium" from their lender. *Id.* at 370. Citing to the RESPA regulations, the plaintiffs argued that because their lender had paid their broker a thing of value tied solely to the value of the loan, the payment was an illegal referral fee. *Id.* at 371. The defendant argued that this fee was not a referral fee, but instead was the market driven payment to the broker for the purchase of the loan. *Id.* The court concluded that, because the undisputed evidence revealed that the payment reflected the market value of the loan, the payment was a legitimate payment "for goods" permitted under RESPA section 2607(c)(2). *Id.* at 372.

In *Martinez*, the district court considered allegations that payments of various fees and a "par-plus premium" to a broker by a lender violated RESPA. *Martinez*, 959 F.Supp. at 1520–22. The plaintiff argued that the various payments and the "par-plus" payment were duplicative and excessive and thereby in violation of RESPA. *Id.* at 1521. After considering the record, the court found that the lender had offered uncontradicted evidence that it had performed various services and that some of the payments had been for those services actually performed. *Id.* at 1521. The court found that, in light of this evidence, plaintiff's mere allegations that the payments were excessive and duplicative were not sufficient to survive summary judgment. *Id.* at 1521. As regards the "par-plus" payment, however, the court found that there was a dispute of material fact as to what the payment was for. *Id.* at 1522. In particular, the court could not find any services that the fee compensated the broker for

other than "obtaining a bad deal" for the plaintiff/borrower. *Id.*

Finally, in *Barbosa*, the district court also dealt with a challenged "yield-spread" payment made by a lender to a broker. *Barbosa*, 968 F.Supp. 1548, 1551. The plaintiffs argued that the payment violated ·RESPA's prohibitions on referral fees in section 2607(a) and on splitting fees in section 2607(b). *Id.* The court first found that the challenged payment was not a referral fee, but instead was for the broker's procurement of a higher interest rate loan with a payment option that relieved the borrower of the burden of paying the broker at closing. *Id.* at 1556–58. After thorough consideration, the court also found that the payment of the "yield-spread" was reasonable compensation for the services rendered and was not illegal under either section of RESPA. *Id.* at 1562–63. The court reached this conclusion by first determining that the reasonableness of a fee should be "ascertained by looking to the processes that resulted in the payment of that particular fee." *Id.* The court then concluded that arms-length bargaining set the price of services in the case before it. *Id.* Regardless of the plaintiff's lack of knowledge regarding the fee, the court reasoned that the lender had an interest in ensuring that its brokers were reasonably compensated for their closing services. *Id.* Since some borrowers may have lacked the money to pay the brokers up front for their services, the court reasoned that the lender offered the brokers an option of having such borrowers pay the brokers' fee over the life of the loan through a higher interest rate. *Id.* According to the court, borrowers participated in this market transaction by having the option of rejecting this higher interest rate loan and searching elsewhere in the market for a better rate. Id. at 1563.

### (3) *The Case at Bar*

■ As a preliminary matter, the court finds that Plaintiff has standing to bring this action. Defendant Ford argues that, since it paid the 4% fee to Defendant B & H, Plaintiff does not fall within the statutory section which allows RESPA suits by the "person or persons charged for the settlement service involved in the violation . . . ." *See* 12 U.S.C. § 2607(d)(2). However, the court finds that Plaintiff also incurred ·the charge for the services in question because she was given a higher interest rate over the life of the loan. There is nothing in the statute which requires the payment be directly charged or made by only one person. In this case, the undisputed evidence indicates that the higher 1% interest rate that Plaintiff was charged on her loan, over its life, would have equaled the 4% fee that Defendant Ford paid to Defendant B & H at closing. *See Barbosa*, 968 F.Supp. 1548, 1556 (rejecting similar standing argument on grounds that the plaintiffs, in economic sense, ·were also charged for the services).

As to the merits, .the primary facts in the case at bar are not in dispute. What is in dispute is what the specific 4% fee paid by Defendant Ford to Defendant B & H was "for": Was it a fee paid solely for the referral. of business, or was it reasonable compensation for services actually rendered? The court recognizes that Defendant Ford's system of Program I and Program II brokers does create some concerns. (*See* Hearing of June 4, 1997, Tr. at 44–45). Also, there is conflicting testimony in the record regarding whether or not Program I and Program II brokers performed the same services.[4] Taking this conflicting evidence in a light most favorable to Plaintiff, it appears to the court that Defendant Ford paid some brokers for services but not all of them.

■ However, the court concludes that the record in this individual case mandates that summary judgment be granted for Defendant Ford. The court reaches this result because the record lacks any evidence that the fee paid by Ford to B & H was paid for the referral of business and was not merely a

---

4. For example, both William Hickey, an assistant district manager at the time of this suit, and Michael Armstrong, an account executive, offered deposition testimony indicating that Program I and Program II brokers may have performed the same services, while Denny Hanysak, Defendant's President, testified that Program II brokers offered a "full package" of services and Program I brokers did not. (*See* Hickey Dep. at 53; Armstrong Dep. at 12; Hanysak Dep. at 12–13).

reasonable compensation for services actually rendered. To put it another way, there is no indication in the record that the broker, B & H, would have received a lower total amount of compensation if it had sought to procure a loan from another lender or if it had elected to participate as a Program I broker.

First, the undisputed evidence in the record reveals that Plaintiff's broker, B & H, did perform services in connection with her obtaining a loan. After receiving the necessary paperwork from Plaintiff, B & H counseled her on her loan options, verified her employment and current income information, obtained her credit report and payoff information for her first mortgage and back property taxes, arranged for an appraisal of the property, arranged for a closing attorney, attended the closing, and provided her with a good faith estimate on February 3, 1995. (*See* Ward Dep. at 31–33; Plaintiff's Statement of Material Facts, ¶¶ 8, 10, 12, 13, 34, 41). B & H then submitted Plaintiff's loan application package to Defendant Ford and, at Ford's request, later provided additional necessary documentation.[5] Furthermore, it is clear that, prior to the loan being closed, some party had to perform these necessary settlement services.[6]

Second, the only evidence in the record as to the manner of the payment of fees to brokers is that they are calculated as a percentage of the net loan amount.[7] Plaintiff argued at the June 4 hearing that the failure of Defendant to itemize a price in connection to each particular service indicated that the percentage fee was for the referral and not actually for services. (*See* Hearing of June 4, 1997, Tr. at 34).[8] Although this is an interesting argument, Plaintiff has offered absolutely no evidence on the payment plans of other brokers and lenders. Without any deposition testimony or affidavits of actual lenders paying flat fees for certain closing services, or brokers charging flat rates, this court has no evidence upon which to question Ford's method of billing.

Third, and most importantly, Defendant Ford has offered uncontroverted evidence indicating that the amount Ford paid to B & H was within the market rate for the closing services provided by the broker. Ward, for example, testified at her deposition that she did not have a standard amount that she charged her customers, but that, given the services she performed, the 4% fee she charged Plaintiff was less than she normally

---

5. Defendant has submitted with its motion for summary judgment, an informal HUD opinion, authorized by Assistant HUD Secretary Nicholas P. Retsinas, defining what broker fees would be considered sufficient to justify compensation for services actually rendered. (*See* Defendant Ford's Motion for Summary Judgment, Exhibits A & B, Feb. 14, 1995 HUD Informal Opinion). This letter explains HUD's interpretation and enforcement of Regulation X's ban on kickbacks and referrals. The letter states that the "mere taking of an application" by a broker is not sufficient work to justify compensation. (HUD Informal Opinion, at 2). However, the letter states that, if the broker provided five or more loan origination services and the fee paid to the broker was reasonably related to the market value of those services, then HUD would consider there to have been no RESPA violation. (*Id. at* 2–3). The HUD letter lists the services that are normally performed at the origination of a loan as, among others: (1) taking information from a borrower and filling out the application; (2) analyzing the prospective borrower's income and debt; (3) collecting financial information that is part of the application process; (4) ordering employment verifications; (5) ordering appraisals; (6) providing disclosures; and (7) participating in the closing. (*Id.*).

Although Plaintiff is correct in stating that this letter does not carry any other weight than the opinion of the individual writer, the court notes that B & H undisputedly performed over five of the services listed in this letter while originating Plaintiff's loan.

6. Although there is evidence suggesting that Defendant Ford may have performed a few of the same services performed by B & H after it received Plaintiff's loan application, the court does not believe that this impacts at all on the fact that B & H performed these services. It makes sense to the court that Defendant Ford would wish to double-check and verify certain parts of the application before approving the funding of a loan.

7. In this case, Ward received a total payment equal to 8% of the net total loan amount, a sum equal to $2,300.90.

8. As an illustration of an alternative payment plan, Plaintiff's counsel suggested at the hearing a flat fee for the performance of individual settlement services, such as $100.00 for taking information, $400.00 for analyzing the borrower's income, and $87.50 for collecting financial information. (Hearing of June 4, 1997, Tr. at 34).

would have charged. (Ward Dep. at 27–28). She further testified that the fee she received from Defendant Ford for the services she performed in connection with Plaintiff's loan was approximately the same as she would have received from other lenders for the same services. (Ward Dep. at 34). Based on her familiarity with the Atlanta market, she stated that her fee was a market rate for the services she performed. *(Id.)*. Denny Hanysak, Defendant's president at the time, testified that, when Defendant set up its broker fees, it first looked at the ways that brokers did business and the compensation levels that they received from other lenders. (Hanysak Dep. at 24–25). He stated that Defendant had concluded that 8% was the marketplace value for the services a broker provided in connection with putting a loan package together. *(Id.)*. He also indicated that it would cost more than 8% of the net loan amount for Ford itself to originate and put a loan package together without the assistance of a broker. *(Id.)*. Plaintiff has argued extensively that the 4% fee paid by Plaintiff to B & H fully compensated B & H for those services and that the 4% fee paid by Defendant therefore was duplicative. *(See* Hearing of June 4, 1997, Tr. at 31). Plaintiff, however, has failed to produce any evidence that any fee beyond 4% fee was not a reasonable market rate for the work that B & H performed. Furthermore, Plaintiff has not produced any depositions or affidavits stating that 8% of the net amount of a loan is not a reasonable fee for the work done in preparing a loan application package. An affidavit by a Program I broker indicating that he had performed work in putting a loan package together but had received only 4%

of the value of the loan would suggest that the 4% fee paid by Ford to Program II brokers was not really for services rendered. Likewise, testimony by any other broker operating in the Atlanta market that he received only 4% of the net value of a loan would raise a question of fact as to the purpose of Ford's payments. However, since the record is bereft of such evidence, the court can only conclude that the compensation that B & H received in this case was a reasonable market amount for the work it did in preparing, packaging, and closing the loan before it sent the application to Ford.[9]

In conclusion, a broker is entitled to compensation for the services that the broker performs in originating a loan for a potential borrower. The court is not aware of any RESPA provision that states that a broker cannot have portions of the fee paid by both the borrower and a lender.[10] In this case, the broker performed settlement services and was paid a fee. Further, Defendant Ford has offered uncontradicted evidence that the total fee received by the broker was within the market rate for the work performed. As a result, this court can only conclude that the payment was "compensation ... for services actually performed." Given that fact, there is no evidence to suggest that Ford's payment was anything other than a permissible payment under RESPA section 2607(c)(2). Defendant Ford is therefore entitled to summary judgment on Plaintiff's RESPA claims, and Plaintiff's cross motion is DENIED.

*c. 12 U.S.C. § 2607(b)*

Plaintiff also brings, in Count I of her amended complaint, a claim that Defendant

---

9. In *Dubose*, the court refused to grant summary judgment in an action dealing with yield-spread payments made by a lender to a broker. *Dubose*, 974 F.Supp. 1426, 1431–32. However, in that case, there was no evidence that the fee paid by the borrowers to the broker was anything other than complete compensation for the loan origination services performed by the broker. *Id.* Furthermore, the defendants had made no argument that the par-plus premium that they paid to the broker was for services performed. *Id.* at 1432. In the present case, in contrast, Defendant argues that its fee was compensation, and the only evidence in the record indicates that the total amount received by Defendant B & H was within the market rate for the services involved.

10. Indeed, the court notes that a June 1997 HUD booklet, "Buying Your Home—Settlement Costs and Helpful Information," 62 Fed.Reg. 112, 31983 (June 11, 1993), advises potential home buyers that their mortgage broker "may be paid by the lender, you as the borrower, or both ...." (Supplemental Exhibits of Defendant Ford in Support of its Motion for Summary Judgment, Exhibit 1). The court in *Barbosa* also recognized that "it is entirely conceivable that the parties might structure the mortgage transaction to permit the borrowers and the lender to share in paying the broker's commission." *Barbosa*, 968 F.Supp. 1548, 1560.

Ford violated section 2607(b) of RESPA and its prohibition on the splitting of settlement services which are not actually performed.[11] In its motion, Defendant Ford moves for summary judgment on this claim.

Since this court has found that Plaintiff has offered no evidence that the fee paid by Defendant Ford to Defendant B & H was not compensation for services actually performed, Defendant Ford is also entitled to summary judgment on this claim. *See Barbosa*, 968 F.Supp. 1548, 1559–60 (recognizing that if payment compensated a broker for services actually rendered, then there was no liability under either RESPA section 2607(a) or (b)).

### 2. *Tortious Interference with Contract*

In Count IV of her amended complaint, Plaintiff asserts that Defendant Ford intentionally interfered with her agency contract with Defendant B & H. She contends that Defendant Ford, by offering its 4% fee to B & H, intentionally induced B & H to break its contract with her and steer her toward a higher interest rate loan that was not in her best interests. Defendant argues that it entered into an agreement with B & H under which B & H agreed to be a Program II broker before Plaintiff entered into any agreement. As a result, Defendant Ford contends that when it offered the Program options to B & H, it did not interfere with an existing contractual relationship. Furthermore, Defendant Ford argues that the undisputed evidence demonstrates that Plaintiff independently contracted with a Program II broker and she received the only loan that she was entitled to from Ford through her broker. As a result, Defendant contends that there is no evidence that it hindered the performance of Plaintiff's contract.

■ In Georgia, in order to establish a claim for tortious interference with a contractual relationship, a plaintiff must show the "intentional and non-privileged interference by a third party with *existing* contractual rights and relations." *McDaniel v. Green,* 156 Ga.App. 549, 550, 275 S.E.2d 124 (1980) (emphasis added). A claim is actionable if the interfering party causes a breach of the contract, retards performance of duties under the contract, or makes its performance more difficult or expensive. *Id.* (Citations omitted).

■ As the court construes it, Plaintiff's argument is essentially that Defendant Ford offered B & H an inducement to sign up its borrowers to higher interest rate loans under Program II when they otherwise could have signed up for lower interest rate loans under Program I. One of the flaws with Plaintiff's claim is that the record is lacking in evidence showing that Defendant Ford hindered the performance of her contract with Defendant B & H. There is simply no evidence in the record that Defendant B & H could have procured a better loan from Defendant Ford than the one Plaintiff received. Although Plaintiff complains of the higher Program II interest rate, as discussed *supra,* the undisputed evidence indicates that the total fee paid to her broker was within the reasonable market for the services performed. It follows that if Plaintiff sought to procure a loan through a Program I lender, then she would have had to pay a greater fee directly from the loan proceeds at closing. Viewed in this way, the undisputed evidence indicates that Defendant's action merely altered the manner in which Defendant B & H received the reasonable, market rate compensation that it would have received for its services under any loan program.

A second flaw with Plaintiff's argument is that, at the time Defendant Ford offered Defendant B & H a choice between Program I and Program II, Plaintiff did not have an existing contractual relationship with B & H.[12] Indeed, at that time, there is no evi-

---

**11.** 12 U.S.C. § 2607(b) states that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

**12.** The undisputed evidence indicates that Defendant Ford and Defendant B & H entered into an agreement that provided that B & H would be a Program II broker. Pursuant to this agreement, Defendant B & H could only offer its borrowers certain loans from Ford that were at different interest rates than those available under the al-

dence that Ford had any knowledge that Plaintiff would later have a contract with Defendant B & H. When Plaintiff did finally walk into the doors of B & H's office and retain it as her broker, Defendant Ford already had an agreement with B & H that limited the loan options that B & H could seek from Ford to Program II type loans. Both Defendant Ford and B & H acted pursuant to this pre-existing · agreement in obtaining a loan for Plaintiff at the only interest rate that B & H could obtain for her from Ford. Although she argues otherwise, Plaintiff has offered no evidence that she was eligible for any other interest rate loan from Defendant Ford through B & H. Consequently, Plaintiff's only evidence of tortious interference with contract by Defendant is its loan offer made consistent with the terms of a pre-existing agreement with B & H. The court is not aware of any authority for the proposition that performance pursuant to a valid, pre-existing agreement can constitute tortious interference with a separate contract entered into on a later date. In fact, the weight of authority suggests otherwise. *Cf. Forehand v. Perlis Realty Co.*, 198 Ga.App. 165, 166, 400 S.E.2d 644 (1990) ("no liability for procuring a breach of contract exists where the breach is caused by the exercise of an absolute right—that is, an act which a man has a definite legal right to do without any qualification."); *J.C. Penney Co., Inc. v. Davis & Davis, Inc.*, 158 Ga.App. 169, 170–71, 279 S.E.2d 461 (1981) (where contract provided party with absolute right to reject work, that party's rejection of work could not constitute tortious interference with another party's contract); *Allstate Beer, Inc. v. Julius Wile Sons & Co., Inc.*, 479 F.Supp. 605, 612–13 (N.D.Ga.1979).

Accordingly, for the foregoing reasons, Plaintiff's motion for summary judgment on this count is DENIED and Defendant Ford's motion for summary judgment is GRANTED.

ternative Program I option. Plaintiff, approximately six months later in early 1995, entered into an agreement with B & H pursuant to which B & H agreed to provide her with services in connection with obtaining a loan. Defendant B

### B. *Plaintiff's Motion for Summary Judgment Against Defendant B & H*

Plaintiff also moves for entry of summary judgment against Defendant B & H on her RESPA claims and her state law claims of breach of fiduciary duty and fraudulent concealment. Defendant B & H has not filed any response to this motion and, in fact, appears to be unrepresented at this time.

#### 1. *RESPA Claims*

For the reasons discussed *supra*, the court concludes that there is no private cause of action for violations of 12 U.S.C. § 2404(c). In addition, for the reasons discussed *supra*, based on the undisputed evidence in the record at this time, the court concludes that Plaintiff lacks evidence to show that the 4% fee that Defendant B & H accepted from Defendant Ford was a referral fee in violation of RESPA.

As a result, Plaintiff's motion for summary judgment on her RESPA claims is DENIED.

#### 2. *State Law Claims*

##### a. *Breach of Fiduciary Duty*

Plaintiff contends that Defendant B & H, as her agent, owed her a fiduciary duty to obtain the best loan possible for her. Plaintiff asserts that Defendant B & H breached this duty by committing her to a Program II loan at a higher interest rate than that offered under Program I and by making a personal profit at the same time.

Under Georgia law, an agency relationship is established when one party, expressly or by implication, authorizes another to act for him. *See* O.C.G.A. § 10–6–1. The relationship between an agent and a principal is fiduciary in nature. *McLane v. Atlanta Market Center Management*, 225 Ga.App. 818, 825, 486 S.E.2d 30 (1997). As part of the contract by which the agency relationship arises, the agent agrees to exercise loyalty and absolute good faith in dealing with the principal. *Id.* (Citation omitted). An agent

& H then obtained a loan for Plaintiff from Defendant Ford at the one rate that it could · obtain under Program II for a person of her background and credit risk classification.

who breaches these fiduciary duties is liable in tort for damages. *Id.*

██ In the instant case, Plaintiff has offered undisputed evidence that an agency relationship existed between her and Defendant B & H. As a result, B & H owed her a fiduciary duty. Plaintiff, however, lacks sufficient evidence for this court to enter summary judgment in her favor. First, Plaintiff has failed to point to any evidence in the record that Defendant B & H could have obtained for her a better loan from Defendant Ford or for that matter from any other lender. Instead, the undisputed facts indicate that, as a Program II broker, Defendant B & H obtained for Plaintiff the best interest rate that it could have obtained for her from Ford. *See, e.g, Van Den Berg v. Northside Realty Associates, Inc.,* 172 Ga.App. 591, 592–93, 323 S.E.2d 839 (1984) (plaintiff who failed to produce evidence that her home price had been below market value could not survive summary judgment on her claim that her real estate agents breached their fiduciary duty by underpricing her home in order to sell it quickly). Second, since Plaintiff has not shown that an 8% fee was an unreasonable market rate for the settlement services performed by B & H, there is no indication that B & H earned any greater personal profit by steering her to Defendant Ford's loan. Instead, the undisputed evidence indicates that even if B & H had elected to be a Program I broker, it would have required additional compensation from Plaintiff out of the loan proceeds at closing.

As a result, the court concludes that Plaintiff is not entitled to summary judgment on her breach of fiduciary duty claim.

b. *Fraud by Concealment*

Plaintiff argues that Defendant B & H committed fraud by failing to inform her that it was receiving a fee from Defendant Ford, that it was a Program II broker, that Program I brokers existed, or that corresponding loans under Program I were lower than Program II.

██ Under Georgia law, fraud occurs when a party conceals or suppresses a material fact that it has a duty to disclose. *Tower*

*Financial Services, Inc. v. Jarrett,* 199 Ga. App. 248, 250, 404 S.E.2d 622 (1991). Pursuant to O.C.G.A. § 7–1–1013(2), a broker is prohibited from concealing "material factors, terms, or conditions of a transaction to which the ... broker is a party, pertinent to an applicant for a mortgage loan" and therefore has a duty to disclose such information.

██ In the instant case, for substantially the same reasons that the court granted Defendant Ford's motion for summary judgment on a virtually identical fraud claim, Plaintiff's motion against Defendant B & H is due to be denied. (*See* Hearing of June 4, 1997, Tr.. at 48–54). The undisputed evidence reveals that, at the time of closing, Plaintiff was given a HUD–1 Settlement Statement that revealed that Defendant B & H was being paid a 4% fee by Defendant Ford. Furthermore, the court does not find that it was fraud for B & H to fail to tell Plaintiff about the existence. of Program I and Program II and that she might be able to obtain more favorable loans from another Program I broker. Given that B & H chose to participate in Program II, there is no evidence that Plaintiff could have obtained a lower interest rate loan from Ford through B & H. If any other, better loans were available, they were only available from other brokers and lenders. To the court, a fraud is not perpetrated every time a broker fails to tell a borrower that more favorable loans may be available from other brokers. In the open marketplace, there is simply no obligation to reveal that a competitor across town might offer a more favorable deal.

As a result, the court DENIES Plaintiff's motion for summary judgment against B & H on the fraud claim.

III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [25–1] is DENIED and Defendant Ford's motion for summary judgment [27–1] is GRANTED.

The parties are hereby DIRECTED to submit their joint pretrial order on any remaining claims within thirty (30) days of the

date of this Order. (*See* Revised Case Instructions at ¶ 7).